ALLEN RUBY (Bar No. 47109)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California  94301-1908
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570
Email:  allen.ruby@skadden.com

Attorneys for Defendant 3TAPS, INC.

Additional Counsel Listed on Next Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CRAIGSLIST, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>3TAPS, INC., a Delaware corporation;<br>PADMAPPER, INC., a Delaware corporation;<br>and DOES 1 through 25, inclusive.<br><br>Defendants.<br>_____<br><br>3TAPS, INC., a Delaware corporation,<br><br>Counter-claimant,<br><br>CRAIGSLIST, INC., a Delaware corporation<br><br>Counter-defendant. | **Case No.** CV-12-03816 CRB<br><br>**DEFENDANT 3TAPS, INC.'S<br>FIRST AMENDED COUNTERCLAIM**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Honorable Charles R. Breyer |

JAMES A. KEYTE (admitted *pro hac vice*)
MICHAEL H. MENITOVE (admitted *pro hac vice*)
MARISSA E. TROIANO (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (917) 777-3000
James.Keyte@skadden.com
Michael.Menitove@skadden.com
Marissa.Troiano@skadden.com

CHRISTOPHER J. BAKES (SBN 99266)
M. TAYLOR FLORENCE (SBN 159695)
LOCKE LORD LLP
500 Capitol Mall, Suite 1800
Sacramento, California 95814
Telephone: (916) 930-2500
Facsimile:  (916) 930-2501
cbakes@lockelord.com
tflorence@lockelord.com

JASON MUELLER (Texas Bar No. 24047571) (admitted *pro hac vice*)
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8844
Facsimile: (214) 740-8800
jmueller@lockelord.com

*Attorneys for Defendant*  3TAPS, INC.

Defendant 3taps, Inc. ("3taps"), by and through its undersigned counsel, files these amended Counterclaims (the "Counterclaims") against craigslist, Inc. ("craigslist"), and alleges on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

## NATURE OF THE CASE

1.      This is an antitrust, unfair competition, and interference with economic advantage action against craigslist, a longstanding monopolist of certain markets for online classified advertising ("online classified ads").  craigslist has an overwhelming share in numerous online classified ad markets and improperly maintains those monopoly shares through the broad-based, anticompetitive scheme described below.

2.      3taps is *not* alleging that craigslist *acquired* its widespread monopoly power improperly—far from it; craigslist should be applauded for bringing online classifieds into the modern age and achieving its initial dominance over various U.S. markets for the "onboarding" (i.e., the process of inputting and uploading factual content on the internet) of user-generated classified ads by those seeking a personal exchange transaction for various goods and services, including apartment rentals, jobs, personal services, general goods, and other sales.

3.      Nor does 3taps complain about the fact that craigslist's dominance in the onboarding of user-generated online classified ads enabled it to naturally acquire monopoly power over two distinct but related markets:  the market for search-engine indexing of publicly available factual content contained in those online classified ads so that these ads can be searched (which is precisely what 3taps is doing, just much better than craigslist); and the downstream "search" marketplace itself, which, in addition to craigslist, includes specialized, exchange-focused search products and tools that make it easier for consumers to find and execute the exchanges they desire.

4.      Instead, what 3taps *is* complaining about is how craigslist has *maintained* (and continues to maintain) its monopoly power in these three related markets for the onboarding, indexing, and searching of classified ad content (the "Relevant Markets").  Certainly, craigslist has not maintained this power by competing on the merits.  For years, craigslist has espoused the classic principles of a monopolist that believed it did not need to compete:  a "strategy" of

1

1  "unbranding," "demonetizing," and "uncompeting" —the epitome of a lethargic monopolist.  And

2  why not?  As an unchallenged monopolist across these various markets, craigslist has generated

3  revenues somewhere between $100-$300 million per year, and that's without sinking any

4  significant costs into research and development or innovation.

5       5.      Eventually, of course, consumers demanded more.  By the early-2000s, consumers

6  of online classified ads were growing increasingly frustrated with the antiquated search and

7  execution capabilities of the craigslist website.  Yet their hands were tied:  because craigslist had

8  built up such massive volume in achieving its monopoly status, the resulting "network effect"

9  meant that a user's best chance to obtain a successful classified ad exchange remained by posting

10  (or searching) on craigslist, notwithstanding attempts by others to enter these marketplaces.

11      6.      In the face of this massive, unmet consumer demand, 3taps and others rose to the

12  challenge.  Using publicly available data accessed through general search engines, including

13  Google, 3taps spent several years (and millions of dollars) creating a significantly more robust

14  index and categorization of user-generated classified ads onboarded onto craigslist and other

15  classified ad websites.  In turn, 3taps makes that database available through its own application

16  program interface ("API") to exchange-specific search developers that are ready, willing, and able

17  to fill the consumer-demand void left by craigslist.  Indeed, 3taps also developed its own exchange-

18  related search engine—"craiggers," which searches craigslist data better than craigslist's search

19  function—as well as an even more comprehensive search engine, called JeBoom, which searches

20  across multiple classified ad websites.

21      7.      Until August 2012, after craigslist brought its first set of baseless claims against

22  3taps, 3taps created its index without accessing craigslist's servers—thus engaging only in the type

23  of competitive challenges that craigslist's founder, Craig Newman, publicly condoned and

24  welcomed.  In July 2010, on the question and answer site quora.com, Mr. Newmark responded to

25  the question:  "*Why hasn't anyone built any products on top of craigslist data?  Is it a matter of*

26  *craigslist policy not letting people use the data?*"  Mr. Newmark wrote:  "*Actually, we take issue*

27  *with only services which consume a lot of bandwidth, it's that simple*."  Critically, because 3taps

28

3TAPS' FIRST AMENDED COUNTERCLAIM                          CASE NO.: 12-CV-3816-CRB

1   sourced content posted on craigslist from caches (i.e., archives) maintained by Google, 3taps did

2   not consume craigslist's bandwidth at all.

3          8.      craigslist was well aware of these facts long before it initially filed this suit against

4   3taps.  On March 7, 2012, craigslist sent 3taps a cease & desist letter accusing 3taps of violating

5   craigslist's Terms of Use by "scraping" content from the craigslist website, and thereby consuming

6   craigslist's bandwidth.  3taps responded with a letter dated March 13, 2012, in which it explained

7   that 3taps obtained content posted on craigslist without visiting craigslist's website, and therefore,

8   without consuming any of craigslist's bandwidth.

9          9.      By this time, consumers were in fact desperate to see innovation in the online

10  classified ad exchange markets, and developers were poised to meet this demand.  For example,

11  AirBnB is an online service that matches people seeking vacation rentals and other short-term

12  accommodations with those who have rooms to rent.  AirBnB offers enhanced search and

13  interaction capabilities that augment a user's experience, such as sorting by popularity, enabling

14  saved "wish lists," and offering payment tools.  On July 26, 2011, the Wall Street Journal reported

15  that AirBnB had raised a $112 million round of financing, valuing the company at $1.3 billion.

16         10.     Similarly, PadMapper is an online service that, using 3taps' API, aggregates

17  apartment postings from multiple websites online and offers improved search capabilities, like a

18  map that displays postings, sorting by additional categories, and email alerts for new listings that fit

19  a user's preferences.

20         11.     Likewise, Lovely, also using 3taps' index, offers an online service for apartment

21  searches that includes a map and alerts.  Each of these services enhances search and interaction

22  capabilities for online classified ads in direct competition with craigslist's antiquated capabilities.

23  In fact, in nearly every online classified ad product space, search innovators have been or are

24  poised to use the pre-staged index created by 3taps to compete against craigslist's search and

25  interaction capabilities and, where successful, in onboarding as well.

26         12.     Notably, the specialized search engines that are powered by 3taps actually direct

27  traffic *to*, rather than away from, craigslist.  When a user searches for online classified ads on

28  craiggers or PadMapper and finds information about an ad that was originally onboarded onto

3

1   craigslist, the user then is redirected back to craigslist to complete the exchange, thus driving

2   business back to craigslist.  As a result, these specialized search engines actually benefit craigslist's

3   business.

4          13.     craigslist's response to this necessary and predictable outburst of innovation was not

5   what one would expect from a company that purportedly prides itself on being a good citizen and a

6   supporter of the unfettered use of publicly available factual information on the internet.  Nor is it

7   the behavior one would expect from a company that actually benefits from increased traffic as a

8   result of 3taps' innovation in the indexing market for online classified ads.  craigslist realized that

9   it was too late for it to compete on the merits and innovate in the markets for indexing and

10  search—it knows that innovators in indexing and search can offer more attractive products than

11  craigslist in those markets and can rely on those superior offerings to challenge craigslist's

12  dominance in these markets, and eventually in the onboarding market as well.  Accordingly,

13  instead of competing on the merits, craigslist devised and implemented a multifaceted

14  anticompetitive scheme to stop these nascent competitors in their tracks.  And while craigslist may

15  have been too late to thwart the rapid growth of AirBnB in the vacation rental space, it certainly

16  was not going to tolerate 3taps becoming an indexing and categorization platform from which other

17  execution-focused specialized search engines could displace craigslist's monopoly lock over other

18  product spaces.

19         14.     craigslist's overall scheme is composed of several parts (summarized below), each

20  of which both violates the antitrust laws and is aimed to further craigslist's overall scheme to

21  maintain its monopoly power by impeding innovation, forcing 3taps' actual and potential business

22  partners to exit the Relevant Markets, and attempting to force 3taps to cease indexing user-

23  generated content posted on craigslist.

24         •   <u>Serial Sham Cease & Desist Letters and Sham Lawsuits</u>

25             craigslist has targeted 3taps and innovating websites that rely on data
               indexed by 3taps with sham cease and desist letters and sham lawsuits—
26             including this lawsuit against 3taps, PadMapper, and Lovely—alleging,
               *inter alia*, copyright infringement and breach of craigslist's Terms of Use.
27             craigslist has threatened and filed lawsuits as part of a policy intended to
               intimidate innovators, raise their costs, and force them to cease competing
28

4

with craigslist.  craigslist's claims are objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and are subjectively intended to harm craigslist's competitors.

craigslist's copyright infringement claims are sham because the data indexed by 3taps (and, in turn, used by its partners) is factual material not subject to copyright protection.  Even if craigslist's users' postings were subject to copyright protection, craigslist does not have standing to enforce any such copyright protection because it is neither the owner nor exclusive licensee of this content.  craigslist was well aware of this fact, which explains why, beginning on or about July 16, 2012—shortly before craigslist originally filed this suit—craigslist imposed a requirement that users make craigslist the exclusive licensee of all posted content.  craigslist was forced to abandon this requirement approximately three weeks later, in the face of user outrage and criticism by web community legal forums.  Yet, craigslist continues to maintain its copyright infringement claims, which are sham on their face given the First Amended Complaint's acknowledgement that the exclusive license requirement no longer exists.

craigslist's breach of contract claims also are sham because, when craigslist originally filed this suit, craigslist knew that 3taps was sourcing content posted on craigslist through Google caches, and therefore, was not subject to craigslist's Terms of Use.  As a result of craigslist's subsequent actions to impede 3taps' ability to source content through Google caches (which, as discussed below, itself are antitrust misconduct), 3taps recently has employed third parties to scrape content directly from craigslist (without impacting craigslist's servers).  But craigslist's breach of contract suit remains sham:  the suit is preempted by the Copyright Act, and craigslist's Terms of Use are unenforceable because they are facially anticompetitive and part of craigslist's antitrust scheme.

- Copyright Misuse

craigslist purports to enforce copyrights on user-generated content posted on its website against 3taps and innovators like PadMapper that rely on 3taps' indexed content.  In the process, craigslist has engaged in copyright misuse because:  (1) as described above, the content that craigslist claims is protected by these copyrights is factual data that cannot be subject to any copyright protection; and (2) craigslist is not the owner or exclusive licensee of users' original postings, and therefore, lacks standing to enforce any copyrights associated with these postings.

- "Ghosting"

"Ghosting" is craigslist's well-documented practice of refusing to upload posts or transmit messages that it believes are linked to its competitors, while falsely informing users who upload posts to craigslist from third party competitor sites that such content actually has been posted or transmitted for other users to view.  In fact, while the user receives a confirmation and can

5

view his or her own post, the post is "ghosted" from anyone else on craigslist.  craigslist engages in "ghosting" under the guise of targeting spam; while minimizing spam is a legitimate goal, in reality, craigslist is ghosting to target and prevent craigslist competitors from gaining traction with users.

- Improperly Restrictive Terms of Use on craigslist's Users

craigslist's Terms of Use include unduly restrictive terms that specifically prohibit developing any application that is interoperable with craigslist and any copying and/or derivative use of any content posted on craigslist.  These Terms of Use further craigslist's overall scheme by prohibiting innovation and deterring any use of user-generated content posted on craigslist.  There is no legitimate business justification for these terms.  Indeed, craigslist and its users would benefit from the development of applications that are interoperable with craigslist.  Further, innovations that make derivative use of factual content posted on craigslist—including those developed by 3taps and its partners—similarly benefit craigslist and its users by facilitating searches of user postings and executions of transactions among users.  Nevertheless, craigslist has imposed these facially anticompetitive Terms of Use to impede innovation because its knows that such developments represent potential challenges to craigslist's dominance in the Relevant Markets.

- Anticompetitive Restrictions on Google Caches

craigslist alleges that it has long-included a "NOARCHIVE" instruction in its HTML content to instruct general search engines, such as Google, not to maintain caches (i.e., archives) of content posted on craigslist, which craigslist's Terms of Use otherwise allow general search engines to index.  craigslist's NOARCHIVE instruction, which essentially tells a search engine not to maintain any record of the content it already has copied, has no legitimate business purpose and is facially anticompetitive.  Perhaps as a result, on information and belief, Google has not honored any such instruction, and craigslist has not enforced the "NOARCHIVE" instruction.  Instead, for years, craigslist has permitted Google to maintain caches of craigslist content, which are readily available to the public.  3taps, in turn, has sourced the content it indexes for its partners from these publicly-available Google caches.

Beginning on or around August 5, 2012 (shortly after craigslist originally filed suit against 3taps), 3taps has been unable to rely solely on Google caches as a source of craigslist content because the raw text data associated with this content no longer is available for electronic copying—perfectly legitimate "scraping."  Google's caches include images of craigslist content, but the quality of these images has been manipulated and degraded for the sole purpose of making them impossible to scrape (even though they can still be read).  On information and belief, 3taps alleges that craigslist has instructed Google, or entered into an agreement with Google, that has led to

these measures to prevent 3taps from sourcing craigslist content via Google caches. craigslist has acted to restrict the long-established availability of its content through Google caches solely to harm competition and block innovation by preventing 3taps from electronically scraping content that remains in the public domain and previously was available for scraping with craigslist's knowledge.

- <u>Blocking 3taps and Third Parties from Scraping Content Posted on craigslist</u>

  After craigslist began blocking Google's access to its details pages, 3taps has employed third parties to scrape user-generated content directly from craigslist's website. craigslist, in turn, is blocking these and other third parties from engaging in the scraping necessary to acquire this content. There is no legitimate business justification for craigslist's conduct. craigslist's Terms of Use prohibit scraping in order "[t]o maintain the integrity and functionality of craigslist for its users." But the scraping conducted by third parties that supply content to 3taps does not threaten to adversely impact craigslist's functionality or the experience of its users. Further, the anticompetitive intent underlying craigslist's conduct is evident from the context of its actions. 3taps only is employing third parties to scrape craigslist's website in order to obtain the type of user content that formerly was available from Google caches in a scrapable form, but is now unavailable because it has been manipulated to prevent electronic copying. If craigslist actually were concerned that scraping by 3taps and/or third parties would be harmful to craigslist or its users, it would not have acted to restrict 3taps' ability to source content via Google caches.

15.     Through this multifaceted scheme, craigslist has sucked the oxygen out of the innovation demanded by consumers and will continue to do so unless enjoined by this Court. Moreover, craigslist already has caused 3taps significant injury—in the form of millions of dollars of lost sunk cost investments and lost opportunities with its partners. Unless enjoined, the harm to 3taps caused by craigslist's anticompetitive scheme could be in the hundreds of millions—if not billions—of dollars, in addition to the harm it has already suffered.

## **JURISDICTION & VENUE**

16.     This court has federal question jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, and 1337, because this counterclaim is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover damages caused by, and to secure injunctive relief against craigslist for it past and continuing violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as alleged herein.

1   17.   This court has supplemental jurisdiction over the remaining claims under 28 U.S.C.

2   § 1367.

3   18.   The Counterclaims arise out of the same matters and transactions described in the

4   First Amended Complaint, and this Court has jurisdiction over the matters and transactions that are

5   the subject of these Counterclaims pursuant to Federal Rule of Civil Procedure 13.

6   19.   Venue is proper in this judicial district under 28 U.S.C. § 1391.  craigslist is

7   headquartered in this district, and a substantial part of the events and injury giving rise to the

8   claims set forth herein occurred in this district.  Upon information and belief, craigslist has engaged

9   in anticompetitive behavior in this district, as alleged herein.

10   **THE PARTIES**

11   20.   Counter-Claimant 3taps, Inc. is a Delaware corporation with its principal place of

12   business in San Francisco, California.  3taps is a platform for developers.  It collects raw data from

13   the internet and re-indexes that data.  3taps then provides free API to innovators for use in their

14   development of advanced, specialized search engine products.

15   21.   3taps created the website craiggers, which offers a specialized search engine for

16   craigslist data indexed by 3taps.

17   22.   3taps also created the website JeBoom, which uses data indexed by 3taps to offer a

18   specialized search engine for classified ad content across multiple onboarding sites.

19   23.   Upon information and belief, Counter-Defendant craigslist is an online classified

20   advertising company with its principal place of business in San Francisco, California.

21   **TRADE AND COMMERCE**

22   24.   The trade or commerce relevant to the Counterclaims is the online classified ad

23   industry in local markets in the United States, as described in detail below.  This industry includes

24   multiple relevant markets in which competition is restrained, including markets for (a) onboarding

25   of classified ad content, (b) indexing of classified ad content, and (c) searching of indexed

26   classified ad content.

27

28

8

25.     Through the activities alleged in these counterclaims, craigslist has improperly maintained its monopoly power in various online classified ad product markets and submarkets in local geographic markets throughout the United States.

26.     craigslist's anticompetitive scheme already has caused injury to competition in these markets and to 3taps' business and property (including 3taps' websites craiggers and JeBoom), and unless enjoined, will continue to do so.

<strong><u>FACTS RELEVANT TO 3TAPS' COUNTERCLAIMS</u></strong>

**I.      craigslist's Rise to Monopoly Power for Certain Online Classified Ads**

**A.      craigslist Thrived Because of Freedom of Exchange on the Internet**

1.      <u>craigslist's Origins and Purported Commitment to the "Open Web"</u>

27.     craigslist originated in 1995 as a listserve to share information about events in San Francisco, but users began sharing information about jobs and other content.

28.     It quickly expanded to a web interface to allow classified ad postings related to events, jobs, and other classified ads in specific market segments, such as apartment rentals, used cars, used goods, services, romance, and friendship.

29.     At the time of its inception through the early 2000s, craigslist founder Craig Newmark expressed his commitment to the open web and net neutrality, advocating, for example, in an October 20, 2006 op-ed piece on CNN.com to "keep the Net as it is now: Neutral, fair and free." *See* cnn.com/2006/US/06/09/newmark.internet/index.html.

30.     This indeed is how craigslist began:  as a fair and free exchange where users could generate and post their content with no purported exclusive licenses in craigslist's Terms of Use that restricted access by its users or others to the factual content in its users' posts.

31.     Maintaining a free and open web is essential to protecting consumers and competition.  *See* William J. Clinton & Albert Gore, Jr., Framework for Global Electronic Commerce 2 (July 1, 1997), available at http://dcc.syr.edu/ford/course/e-commerce-framework.pdf. Crucial to a free and open web is a computer process known as "scraping."  When used to procure non-copyrightable factual content in the public domain through methods that do not have a material impact on a website's servers, scraping is an essential and legitimate process whereby bots copy

9

1   and store information from a webpage on a consistent basis (perhaps daily), to monitor and analyze

2   the contents of the page.  By enabling the collection of such factual content on a faster and more

3   widespread basis, scraping facilitates the ability of developers to gather data to be indexed,

4   searched, and used for other innovative purposes in real time.  Indeed, absent such legitimate

5   scraping, the internet as we know it effectively could not function.

6          32.    Scraping is not "spamming"—the process of indiscriminately sending unwanted

7   materials to large groups of users of a website, which craigslist legitimately has taken steps to

8   diminish.  Though scraped data could be used by spammers who wish to misappropriate and

9   misuse data from other websites, that spamming activity is distinct from the process of scraping,

10  i.e., copying and storing factual, non-copyrightable content from webpages for other legitimate

11  purposes, including innovation.

12         33.    A central part of the craigslist model of onboarding of user-generated classified ads

13  is to allow for anonymized postings.  As users post new content to the website, their identities

14  remain anonymous and users contact each other through the craigslist website, rather than through

15  an interaction application that facilitates real-time interactions.  Where used properly, this practice

16  allows craigslist to monitor legitimately for spam and to protect the personal information of its

17  users.

18         34.    Scraping also is not "hacking"—the process whereby a person or bot circumvents a

19  website's security system to access and steal proprietary or confidential materials from a website.

20  Where—as on craigslist—the information at issue is publicly available factual content posted by

21  users in the public domain, scraping the website's content does not involve the circumvention of

22  security protocols or the procurement of any proprietary information.

23         35.    As craigslist grew, it expanded to other U.S. cities (and eventually, to other cities

24  internationally).  Critically, however, rather than create one mega-database of postings, craigslist

25  cloned its initial website for each local area, confining users to location-based postings and search

26  activities, due to technical as well as Terms of Use constraints.  It therefore has no central

27  searchable index across cities, but instead participates in all of the relevant markets through

28  hundreds of distinct websites.

36.     craigslist now operates over five hundred separate websites for each of the cities in which it offers onboarding services, indexes data, and offers search capabilities to users.

37.     This onboarding process limits the capabilities of the index and search features that craigslist offers to its users.  Because each local website's data is indexed separately, users on craigslist cannot search across contiguous cities simultaneously.  Thus, a user who lives close to two major cities who is willing to purchase goods or services in both cities is forced to search on two separate craigslist sites to find the goods or services for which he or she is looking.

38.     Additionally, use of craigslist's search product results in users simply obtaining all hits for a particular word or category.  craigslist's data is not indexed in a way that allows users to search and sort postings by certain important categories, such as the user that onboarded the content.  This prevents a user from finding all of another particular user's posts or from weeding out posts by a user who re-posts the same ad multiple times.  Moreover, craigslist, through its anticompetitive scheme, seeks to prevent any company from offering a product that would accomplish these goals and has targeted companies like HuntSmartly and SnapStore—which aim to provide a search-by-user feature for craigslist data—with cease and desist letters.

39.     Notably, during the time frame in which craigslist's user base expanded to new cities, the types of content that these users were posting also increased—eventually forcing craigslist to disclaim ownership for this content.  Through a series of public scandals involving alleged prostitution postings that began appearing on the craigslist site in the 2000s, craigslist adamantly took the position that it is not liable for the "communications that originate from the users of [its] services."  *See Dart v. craigslist*, No. 1:09-cv-01385, Doc. 14, Mem. in Support of Mot. for Judgment on the Pleadings, May 4, 2009), 2.  Rather, craigslist disavowed liability for— and implicitly, ownership of—content because "all such ads [on the craigslist website are] created and posted by person who use the craigslist website as a forum to reach others."  *Id.*, 8.

40.     craigslist's Newmark publicly supports CDA 230, a law that protects free speech on the Internet.  In an infographic released by Newmark and the Electronic Frontier Foundation on August 23, 2012, Mr. Newmark takes the position that websites would be forced to "take down users' content upon receiving a complaint if they could be held responsible for it."  *See*

11

1   craigconnects.org/CDA230infographic.  Instead, he advocates for the necessity of "strong

2   protection for *intermediaries* . . . to ensure that the Internet remains a place where everyone has an

3   easy, real-time option for free speech." *Id.* (emphasis added).

4        41.     These public statements demonstrate that craigslist—a so-called "intermediary"

5   forum between its users to "reach each other"—does not claim any ownership of the content posted

6   by users to the craigslist site.  Indeed, craigslist's current Terms of Use state that it "does not

7   control, is not responsible for and makes no representations or warranties with respect to any user

8   content."

9        42.     As craigslist grew, it also implemented new policies governing the onboarding of

10  content to its website.  For example, despite its support for a free and open web where users can

11  generate content that does not belong to craigslist—at least when craigslist is being sued because of

12  that content—craigslist also implemented Terms of Use as it expanded in size, purportedly for the

13  legitimate goals of preserving functionality and preventing harm to the user experience.  While the

14  Terms of Use prohibit a variety of activities, the restrictions exist expressly "[t]o maintain the

15  integrity and functionality of craigslist for its users."

16       43.     According to craigslist, these Terms of Use and other craigslist policies were not

17  meant to stifle competition or prevent access to craigslist data for those who wish to innovate using

18  that data.  As already noted, in July 2010, on the question and answer site quora.com, Mr.

19  Newmark was asked:  "Why hasn't anyone built any products on top of craigslist data?  Is it a

20  matter of craigslist policy not letting people use the data?"  Mr. Newmark responded:  "Actually,

21  we take issue with only services which consume a lot of bandwidth, it's that simple."

22       44.     In practice, however, these Terms of Use, and other actions craigslist has taken,

23  have the object and effect of deterring the innovative use of user-generated factual content even

24  *after* that content is in the public domain.

25            2.     craigslist's Interaction with Google and Other General Search Engines

26       45.     Historically, craigslist has been more than willing to interact with general search

27  engines, which helped craigslist grow to its current dominant positions in the Relevant Markets.  In

28

12

1  fact, craigslist's Terms of Use explicitly carve out an exception for general search engines to allow

2  these companies to access and use craigslist content.

3       46.    As the internet evolved in the late 1990s, Google co-founder Larry Page developed a

4  patented method of searching the internet that established the relevance and authority of web pages

5  as a basis for web search.  This type of search feature, unlike an indexed system that brings back all

6  results that hit on a certain set of criteria, uses a concept that has become known as "PageRank."

7  PageRank is based on how many incoming links a web page has.  This method of search quickly

8  supplanted other models used by Lycos, Alta Vista, and Yahoo.

9       47.    Because PageRank search engines return hits based on which page is the most

10  "authoritative" based on its number of links, these search engines are inadequate vehicles for

11  searching classified ads to execute an exchange of a particular type of product or service.  In fact,

12  PageRank search tools will tend to find the oldest and most stale classified ad postings.

13       48.    Additionally, these search engines do not return the "best" classified ads because

14  user ratings of buyer/seller experiences also represent another form of relevance and authority in

15  the realm of exchange space — something for which a PageRank system does not account.

16       49.    Accordingly, Google and Bing searches only indicate that craigslist is an

17  authoritative place to go for classified ads, but these search engines do not offer an alternative

18  space in which users can post and search for classified ads or where users can execute the best real-

19  time exchange.

20       50.    craigslist has long-allowed Google and other general search engines to access and

21  use their content, presumably because these search engines drive traffic to craigslist, and, in turn,

22  increased the frequency of exchange transactions on craigslist.  craigslist saw PageRank search

23  engines as a way to increase its reach:  any hits in a PageRank search would direct additional users

24  to craigslist, but without increasing competition against craigslist in the indexing or search markets.

25       51.    As long as Google and craigslist have existed, Google has enjoyed free access to

26  craigslist content, and Google has maintained caches (i.e., archives) of this content.  While

27  craigslist now touts a purported "NOARCHIVE" policy—which would require Google to discard,

28

13

1   rather than archive, the content it copies from craigslist pages—Google has never honored any

2   such "instruction," and craigslist has never attempted to enforce any such policy.

3       52.    By injecting classified ad content into the public domain for its own economic self-

4   interest and to the benefit of its users, craigslist has for many years made onboarded data available

5   on the internet outside of the craigslist website.  Thus, Google has published caches of craigslist

6   pages, as Google does for other webpages that appear in its search results and, until recently, these

7   caches (which now only can be read, but not electronically scraped) readily have been available to

8   the public for scraping.

9       **B.**    <u>**craigslist's Monopoly Position in Onboarding of Online Classified Ads**</u>

10       53.    In part because of its interaction with Google, craigslist quickly rose to dominance

11   in the onboarding product market because of the significant improvements that a web-based

12   classified ad website offered over traditional print classified ads in newspapers.

13       54.    Indeed, in paragraph 24 of its First Amended Complaint against 3taps, craigslist

14   concedes that it is the largest online forum for online classified ads.

15       55.    Upon information and belief, while there are some specialized onboarding websites

16   in niche categories, craigslist is the dominant market leader for content onboarding in the

17   submarkets for sales of goods, apartment rentals (in many local geographic markets), sales of

18   services, and potentially other submarkets, and it is the major "classifieds" provider that offers

19   online classified ad content across all categories.

20       56.    craigslist serves between 47 to 60 million unique users per month and is the seventh

21   most visited website in the US.  This dominance translates into a significant advantage in

22   onboarded posts:  craigslist has a 15 to 1 advantage over its no. 2 competitor, Backpage, and a 75

23   to 1 advantage over its no. 3 competitor, eBay Classifieds.  Notably, Backpage was only able to

24   gain the limited traction it currently has by attracting new users after craigslist chose to exit the

25   erotic services submarket in 2010.  The AIM Group reported that "unique visitors to backpage.com

26   increased 15.8%" in the month after craigslist exited the erotic services submarket.

27       57.    This monopoly dominance has made craigslist very lucrative:  AIM estimates that

28   craigslist brings in over $100 million in annual revenues, while traffic counts from alexa.com can

14

1    be used to extrapolate that, based on the amount craigslist charges per post for job listings,

2    apartment listings by brokers, and therapeutic massages, craigslist could be bringing in over $300

3    million in annual revenues.

4         58.    craigslist has achieved significant revenues in the hundreds of millions of dollars

5    and has disrupted and displaced about $6 billion in traditional print classified revenue.  Its gross

6    margin and its profit margin exceeds economic returns of competitive businesses, based on

7    conservative estimates of its expenditures to pay its small staff of fewer than thirty employees and

8    to run its simple computer architecture.  craigslist achieved this profitability all while providing

9    many classified ads free of charge.  It only charges for postings in three submarkets for the

10   onboarding of classified ad content:  (1) $25-$75 for online job postings in each category in select

11   cities, (2) $10 for brokered apartment listings in New York City and Boston, and (3) $10 for

12   posting therapeutic services ads in the United States.

13        **C.     craigslist's Onboarding Dominance Naturally Gave It Monopoly
               Power in the Related Markets For Indexing And Search**

14        59.    craigslist's dominance in onboarding led to a natural acquisition of monopoly power

15   in the related markets for the search-engine indexing of onboarded classified ad content and the

16   search of that indexed data.

17             1.      Search-Engine Indexing

18        60.    Because of craigslist's overwhelming dominance in the online classified ad

19   onboarding market, as well as several related submarkets, craigslist also dominates and controls the

20   search-engine indexing of onboarded classified ads.

21        61.    Because craigslist controls 90% of onboarded content across all segments, no other

22   firm can enter the market for search-engine indexing of classified ads without access to information

23   uploaded onto the craigslist website.  Similarly, in each relevant submarket, craigslist controls 65-

24   90% of onboarded content (or, in the example of the sale of services, 55% or more of onboarded

25   content).

26        62.    craigslist's monopoly power is demonstrated by its historic ability to keep its

27   content out of the indexing market.  For example, Yahoo! Pipes is a platform that provides

28

15

aggregated data from internet websites for use by developers of mashups (which both index the data and/or use the data in downstream search offerings.)  In the past, Yahoo! Pipes tried to include craigslist content from craigslist RSS feeds in its platform.  Once craigslist realized that Yahoo! Pipes was including data from its RSS feeds, craigslist took steps to block Yahoo! Pipes' access to the RSS feed.

63.     Notably, even if craigslist allowed Yahoo! Pipes unfettered access to the RSS feeds, these feeds would not enable Yahoo! Pipes' developers to create an efficient and useful index.  The RSS feeds—which craigslist provides only for non-commercial use—are only updated every fifteen minutes and are limited to the last one hundred postings.  Therefore, if there are more than one hundred postings during a fifteen minute period, those posts simply are lost and never appear in the RSS feeds—rendering those feeds unreliable.  In fact, as much as seventy percent of data is lost because craigslist uses this purposely unreliable access method.  Thus, developers cannot create useful indexes that power downstream search offerings by relying on craigslist's RSS feeds.

64.     3taps is a participant in the search-engine indexing market for classified ads, which it obtained through publicly available sources on the internet.  Absent craigslist's anticompetitive scheme, 3taps would be in the position to use publicly available data to provide better indexed data that can be used in the downstream real-time search markets.

65.     3taps has greatly improved on craigslist's index of onboarded classified ad content in a manner that improves search capabilities.  For example, craigslist's platform, which is separated by city, does not allow content to be indexed or searched by craigslist users on a national basis, nor does it allow a user to search or sort classified data in the most useful or convenient ways.  Among other things, 3taps provides an index that enables search sites to combine listings in two nearby cities so that a user who wishes to view listings in both cities does not have to execute two separate searches on the craigslist website.

2.     Real-Time Search

66.     Similarly, because of craigslist's overwhelming historical dominance in the classified onboarding market, as well as several related submarkets, and because of craigslist's

3TAPS' FIRST AMENDED COUNTERCLAIM                                    CASE NO.: 12-CV-3816-CRB

1  historical control of the indexing market, craigslist possesses monopoly power over the engines and

2  tools used to search these markets.

3       67.    As noted by websites such as wired.com, craigslist is aware of consumer demand for

4  better search capabilities (potentially though apps or other websites), including, for example, a

5  user's ability to exclude re-posted, duplicate classified ads.  But, unfortunately for users,

6  craigslist's search function is limited by the indexing system it has created.

7       68.    Additionally, users want to be able to a) search across geographical markets; b)

8  search across listings from multiple / competing sites; c) have saved searches and "favoriting" of

9  search results; and d) potentially have "safe search" that denotes items that may have been flagged

10 for risk of being stolen or associated with trafficking, beyond the simple flagging system craigslist

11 has in place.  craigslist offers none of these features.

12      69.    Current and potential entrants into the search market are ready, willing, and able to

13 offer improved search capabilities not currently available through craigslist.  For example,

14 craiggers and JeBoom use 3taps' superior indexing product to make these search functions possible.

15 craiggers places listings into different columns, allowing users to have preferred listings visualized

16 simply by clicking on them, without having to open new tabs, or go back and forth between pages.

17 Another distinctive feature is the ability to search across as many neighboring areas as a user wants.

18      70.    PadMapper is another prime example of a company that attempts to meet consumer

19 demand for better search in the submarket for search of classified ads in the housing sector.  For

20 example, using 3taps' index, PadMapper has added latitude and longitude data to user's posts to

21 create a visual map for all housing availabilities in a given area.  PadMapper also provides a forum

22 for users to search all classified ads in the housing sector in one central location.  Upon information

23 and belief, once users of PadMapper's search function were able to experience the superiority of its

24 site, these users began to onboard directly to PadLister, an affiliated feature; in this respect,

25 PadMapper is a direct competitor of craigslist in both the onboarding and search markets.

26      ///

27      ///

28

3TAPS' FIRST AMENDED COUNTERCLAIM                                    CASE NO.: 12-CV-3816-CRB

## II.   CRAIGSLIST SITS ON ITS MONOPOLY POSITIONS AND REFUSES TO INNOVATE IN RESPONSE TO CONSUMER DEMAND

### A.   As the Web Evolved, craigslist Became a Classic Lethargic Monopolist

71.   After gaining its dominant position in the classified ad markets for onboarding, indexing, and search, craigslist has affirmatively chosen not to innovate—the antithesis of competition.  Rather, in its own words, craigslist chooses to unbrand, demonetize, and uncompete.  (source:  http://cdn.conversationsnetwork.org/ITC.Web2.0-Newmark.Buckmaster-2004.10.07.mp3).

72.   As wired.com author Gary Wolf reported, "Think of any Web feature that has become popular in the past 10 years:  Chances are craigslist has considered it and rejected it.  If you try to build a third-party application designed to make craigslist better, the management will almost certainly throw up technical roadblocks to shut you down."

73.   Indeed, craigslist's Terms of Use related to interoperability are a prime example of the type of roadblock that craigslist has used to block the development of third-party search and interaction tools to improve the classified ad market.  craigslist's Terms of Use prevent users from creating search and interaction tools or from using third-party search and interaction tools in their listings, thereby preventing competitors' tools from gaining any traction.

### B.   The Evolution of the Online Marketplace for Classified Ads Led to Increased Attempts to Compete in the Relevant Classified Ad Markets

74.   Despite craigslist's hopes to exist in the internet of the past, innovation on the internet has been occurring at a rapid pace in each of the markets in which craigslist participates, and consumers continue to demand more functionality than craigslist is willing to offer.

75.   Since the advent of craigslist, there have been fundamental shifts in the way users interact with the internet.  In 2004, O'Reilly Media hosted a conference discussing user interaction with the internet, describing "Web 1.0" as a place where users were passive retrievers of information presented to them, while the new internet, "Web 2.0," allows users to create and change their own content in real-time while interacting with other web users.

76.   While many applications, like craigslist, still operate based on Web 1.0 principles, these shifts nonetheless have driven consumer demand for more innovative indexing, search, and

18

1  interaction tools that enhance a user's experience with online content, like online classified ad

2  postings.

3        77.    In turn, new suppliers have tried to enter these markets to meet growing demand for

4  a better way to index, search, and interact with online classified content.  For example, AirBnB

5  offers specialized search capabilities in the submarket for vacation housing classified ads.  AirBnB

6  allows users to search across more refined categories and allows users to save their favorite listings

7  to a personal wish list.  AirBnB's rapid success took craigslist by surprise, and AirBnB thereby was

8  able to avoid the full effect of craigslist's anticompetitive scheme.

9        78.    craigslist has paid lip-service to its desire to have competitors in the Relevant

10  Markets.  For example, craigslist CEO Jim Buckmaster has stated that "to the extent that other

11  companies want to get into the business of providing a free public service [which craigslist does

12  *not* do], we definitely welcome them.  That would take a load off of us."

13        79.    Despite these statements, and despite the prevalence of new entrants poised to enter

14  the onboarding and search markets, craigslist has chosen not to compete on the merits, but rather to

15  implement an anticompetitive scheme (detailed below) to thwart competition in the Relevant

16  Markets.

17        80.    Despite increased customer demand for better indexing, search, and interaction

18  capabilities, and the rise of potential and actual competitors in each of these spaces, craigslist has

19  chosen not to innovate.

20        81.    As Wired.com author Gary Wolf reported, craigslist users "complain about spam …

21  fraud … posting rules, they complain about the search, they complain about uploading images.…

22  They seldom complain about amazing new features they imagine they might possibly want to use

23  because they are too busy complaining about the simple features they depend on that don't work as

24  well as they'd like."  These so-called simple features are the relevant features—like indexing and

25  searching—at the heart of this dispute.

26        82.    As question and answer site quora.com explained, "the [internet] world moves on,

27  and the gaps in [craigslist's] product (due to a stubborn obstinate refusal to invest in technology)

28

19

grow wider and wider.  As tablets, smartphones, etc. disrupt, and craigslist doesn't invest in those platforms, the feature gap grows wider."

83.     craigslist has avoided the research and development costs associated with innovation, and it employs less than thirty people.  This business model has allowed craigslist to remain wildly profitable, despite statements made by Jim Buckmaster and Craig Newmark suggesting that craigslist is a free community organization made solely for the benefit of its users.  For example, in 2004, Mr. Newmark told Bankrate that craigslist is "neither a nonprofit nor a conventional for-profit commercial company. We're something in between, and there is no term to describe what we do.  On paper, we're a for-profit.  But we just don't run like that."  Mr. Newmark then claimed that craigslist is "basically making enough money to pay the bills."

84.     Contrary to these public statements, craigslist apparently brings in anywhere from $100 to $300 million in revenues each year, and craigslist is doing everything it can to prevent new innovative companies from cutting into these revenues.

**III.     3TAPS, SEARCH ENGINES, AND INTERACTION DEVELOPERS RISE TO CHALLENGE CRAIGSLIST'S ENTRENCHED MONOPOLY POSITIONS**

85.     Competitors have entered, or are poised to enter, each of the Relevant Markets in which craigslist competes.  For example, 3taps, Craiggers, and JeBoom—and other competitors in the indexing and search marketplaces—have all researched and developed indexing or search tools that respond to the consumer demands that craigslist is unwilling to address.

**A.     3taps**

86.     3taps observed increasing consumer demand for a better service in the indexing market and responded with innovation that improves upon the outdated and inefficient craigslist indexing product offering.

87.     3taps addresses customer demand for more advanced searching—across multiple geographies, with the potential to save preferences and searches—by creating its own index and API that can facilitate this type of search.  Because specialized, real-time search engines cannot run quickly or efficiently enough to be useful to consumers without 3taps' indexed data, companies like craiggers or PadMapper could not offer their search services to consumers without 3taps.

20

88.     Thus, while 3taps does not operate directly in the onboarding market for online classified ads, it is the crucial bridge between onboarding and real-time search services.  3taps provides a path into the onboarding playing field for real-time search engine companies that have a superior product and would offer an attractive alternative to craigslist.

89.     3taps competes directly with craigslist in indexing.  3taps collects onboarded online classified ad content and re-indexes this data for use in the downstream search market.

90.     3taps can source content for its index through various methods, including using Google caches, scraping, crowd sourcing, or some combination of these methods.

91.     Until recently, 3taps has not needed to access craigslist's servers to source user content posted on craigslist.  Rather, as discussed above, 3taps was able to source this data from publicly available websites other than craigslist, particularly Google.  Google creates caches of the relevant user-generated postings on craigslist, which 3taps used to collect the data underlying each posting.  3taps can then index the data for use by specialized, real-time search engines.

92.     Recognizing that 3taps was able to obtain this information publicly from Google without accessing the craigslist website, craigslist took steps—described below—to make it difficult or impossible to collect the relevant factual information from Google.  Thus, since August 2012, 3taps also has used third parties that scrape data from the craigslist website to obtain the content that 3taps needs to create indexed data for downstream specialized search engines.

93.     Finally, 3taps also is in the process of developing technology that would allow it to obtain the relevant data from craigslist via "crowd sourcing."  Crowd sourcing allows individual web users to make copies of the pages that they are viewing and save them to a cloud cache for use by developers like 3taps.

94.     Using these three methods, or some combination of these three methods, 3taps has found ways to mass harvest and index craigslist data with a minimal, non-material, load on craigslist's servers—an innovative feat which is, as legendary technologist and innovator Paul Graham has called it, "ingenious."

///

**B.     Craiggers, JeBoom, PadMapper, Lovely, and Other Online Classified Search Engines**

95.     Craiggers, JeBoom, PadMapper, and Lovely, as well as other specialized, real-time classified ad search engines, offer search and display offerings that compete directly with craigslist in the search market by using information indexed by indexing companies, such as 3taps.

96.     These companies address consumer demand for searching across multiple neighborhoods and cities, searching across additional criteria, saving searches, and other additional features.

97.     Notably, after searching through the databases on craiggers, JeBoom, or PadMapper, a user who clicks on a craigslist ad that was returned in his or her search results then is redirected to craigslist to complete an exchange.  In this way, the search engines developed by 3taps and its partners actually direct traffic (and therefore, business and revenues) *to* craigslist, rather than away from it.

98.     The relationship between ITA Software, Inc ("ITA") and Kayak.com ("Kayak") in the airline industry provides a good example of what would develop in the online classified ad industry, absent craigslist's anticompetitive scheme.  ITA is an indexing company that scrapes or uses APIs to collect data about flights from all major airlines.  It then provides this data to specialized search engines, like Kayak, which use the re-indexed data to provide users with a better search for airline tickets.  It allows users to do something they could not do with each individual airline's website:  make side-by-side comparisons on a global rather than limited geographic basis—and to make these comparisons across competing alternatives.

99.     Similarly, AirBnB accomplished this feat in the vacation rental classified ad space. It attracted traffic by sending craigslist's users messages indicating that AirBnB offered a service where classified ads for vacation rentals could be posted and searched with better, more advanced tools and interaction services.  As more craigslist users were directed to the AirBnB site as an alternative space in which to post classifieds, craigslist lost significant traffic in this segment to AirBnB.

100.    AirBnB was able to accomplish this feat for several reasons that make it difficult for

22

1    other specialized search engines to follow in its footsteps.  Foremost, craigslist, at the time, did not

2    view AirBnB as a significant threat because craigslist never had a large number of onboarded

3    listings in the vacation rental space.  AirBnB was able to thrive while craigslist paid little attention

4    to its activities.  Second, most start-up specialized search engines do not have the capital that

5    AirBnB has, and therefore they lack the resources to defend against the sham lawsuits that

6    craigslist has filed, or threatened to file, against them.

7           101.    Many search engine companies provide more streamlined and innovative platforms

8    on which users can onboard new classified content.  These companies also offer or support

9    interaction applications, like identity services, messaging tools—like Message.Me or mobi-digger,

10   which send messages directly between two users—payment tools—like PayPal or CloudCash—or

11   credit verification tools.  Other tools include creative visualizations, such as tremaps or

12   steamgraphs, which display creative, visually-compelling versions of onboarded content.

13          102.    As users experience the better search offerings of these companies, they are more

14   likely to onboard new content directly to these competitor sites—which is exactly what craigslist

15   fears.  craigslist fears that it may lose its monopoly power in the onboarding space to new entrants

16   in the market for the real-time search of online classified ads that offer both onboarding and search

17   services.  Accordingly, craigslist now has taken anticompetitive steps—described below—to

18   ensure that it does not lose its monopoly power to any of these specialized search engines.

19          103.    PadMapper provides an example of this phenomenon.  While PadMapper began

20   exclusively as a search tool, craigslist knows that users are beginning to onboard unique content to

21   PadMapper's affiliated site, PadLister.  Thus, craigslist is now targeting PadMapper in the search

22   space to prevent it from becoming a competitor in both the onboarding and search markets.

23          104.    Without 3taps, which offers the essential bridge that allows specialized search

24   engines to attract users, these companies cannot break into the search or onboarding product

25   markets.  And in the face of craigslist's anticompetitive scheme, most, if not all, of these nascent

26   search engine developers are likely to abandon their efforts.

27                            **CRAIGSLIST'S OVERALL SCHEME**

28          105.    Rather than innovating and competing on the merits, craigslist has decided instead

                                           23

1   to engage in a multi-faceted anticompetitive scheme to illegally maintain its monopoly control over

2   the onboarding, indexing, and search markets for online local classified ads.  This scheme, and

3   each of its individual elements, are designed to prevent or scare off the competition in the Relevant

4   Markets, stop 3taps from successfully acting as the indexing bridge between the onboarding and

5   search markets, and to directly injure craigslist's search competitors, such as PadMapper, craiggers,

6   and Lovely.

7   **I.      SERIAL SHAM CEASE & DESIST LETTERS AND SHAM LAWSUITS**

8       106.    craigslist's pattern of targeting competitors with sham cease and desist letters and

9   sham lawsuits is an integral aspect of its overall scheme to maintain its monopoly position in the

10  Relevant Markets.

11      107.    craigslist has threatened, or actually filed, numerous lawsuits—including this suit—

12  accusing competitors and potential competitors of, *inter alia*, copyright infringement and/or

13  breaching craigslist's Terms of Use.  Besides 3taps, PadMapper, and Lovely, other targets of

14  craigslist's policy include, *inter alia*, HuntSmartly, Invatory, for-sale-alert.com, list-alert.com,

15  Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.

16      108.    craigslist engages in this conduct pursuant to a policy of initiating or threatening

17  lawsuits, without regard to the merits of its purported claims, for the purpose of intimidating

18  competitors in the Relevant Markets and forcing them to exit these markets.

19      109.    The claims craigslist articulates in these cease and desist letters and lawsuits are

20  objectively baseless in the sense that no reasonable litigant could realistically expect success on the

21  merits of these claims.

22      110.    With regard to its purported copyright claims in this lawsuit and other actual or

23  threatened suits, craigslist's claims are objectively baseless because, as discussed above, no

24  reasonable litigant in craigslist's position would believe that it has the right to enforce any

25  copyright protection associated with its users' postings.  As an initial matter, it is well-settled that

26  the factual information that craigslist seeks to prevent 3taps and its partners from using cannot be

27  protected by any copyright.  Second, it is settled law that only copyright owners and their exclusive

28

1  licensees have standing to bring copyright infringement suits.  craigslist is neither an owner nor

2  exclusive licensee of its users' postings.

3      111.    craigslist itself knows—and any reasonable litigant would know—that it does not

4  have standing to enforce any copyright protection associated with its users' postings.  As a result,

5  beginning on or about July 16, 2012, craigslist required users to grant craigslist exclusive licenses

6  to posted content.  But, when craigslist was faced with user outrage and widespread public

7  criticism, it abandoned this requirement on or about August 8, 2012.  Incredibly, craigslist's First

8  Amended Complaint acknowledges the abandonment of its exclusive license requirement.  Thus,

9  craigslist's copyright claims are sham on their face, and no reasonable litigant in craigslist's

10  position would believe otherwise.

11      112.    craigslist's breach of contract claims predicated on 3taps' alleged violation of its

12  Terms of Use similarly are objectively baseless.

13      113.    When craigslist originally filed suit against 3taps, neither 3taps nor any third party

14  employed by 3taps was directly accessing craigslist's website to obtain data, and therefore, 3taps

15  was not subject to craigslist's Terms of Use.  At that time, 3taps simply sourced the data

16  underlying content posted on craigslist from caches maintained by Google.

17      114.    craigslist knew this when it filed suit against 3taps and PadMapper, as well as when

18  it sent cease & desist letters to 3taps' other partners, such as HuntSmartly, Invatory, for-sale-

19  alert.com, list-alert.com, Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.  On March

20  13, 2012, in response to a cease & desist letter it received from craigslist, 3taps sent a letter to

21  craigslist explaining that "the policy of 3taps with regards to craigslist data is that any sourcing of

22  that data for insertion via our API be done *without* scraping or visiting craigslist at all.  As such,

23  neither 3taps nor 3rd parties posting to the 3taps API under our terms are using craigslist to gather

24  data and therefore are not subject to craigslist's terms of use."  As a result, no reasonable litigant in

25  craigslist's position would have believed its claims had any likelihood of success at the time they

26  initially were asserted.

27      115.    craigslist's litigation to enforce its Terms of Use remains sham even though 3taps

28  now is utilizing third parties to scrape craigslist user content directly from the craigslist website.

25

1   craigslist's litigation is objectively baseless because any reasonable litigant in craigslist's position

2   would know that its breach of contract claims are preempted by the Copyright Act.  Indeed,

3   craigslist's breach of contract claim is premised on "copying of, and distribution of craigslist's

4   content by 3Taps, its agents, affiliates, and/or other co-conspirators."  (FAC ¶ 85.)  Because

5   craigslist's breach of contract claims are based merely on the alleged unauthorized use of

6   purportedly copyrighted material, these claims are preempted.

7        116.   Further, craigslist's Terms of Use are unenforceable because, as discussed in further

8   detail below, they are facially overbroad and are an integral aspect of an overall scheme to block

9   competition.  As a result, craigslist's breach of contract claims premised on these unenforceable

10   terms are sham.

11        117.   craigslist's subjective intent in sending the aforementioned cease and desist letters

12   and/or filing lawsuits is to force its specialized search engine competitors to exit the Relevant

13   Markets and to stop 3taps from competing with craigslist in the indexing of classified ad content.

14   As discussed above, craigslist knows that the platform 3taps provides is crucial to any competitor

15   in the search market.  By blocking access to 3taps' platform, craigslist hopes to inhibit competition

16   in search and maintain its dominance in the Relevant Markets.

17        118.   In this respect, craigslist's anticompetitive scheme already has been successful.  For

18   example, after craigslist brought this baseless suit against 3taps, several of 3taps' search engine

19   partners exited the downstream market, and craigslist was thereby able to avoid competition with

20   these competitors, such as HuntSmartly, Invatory, for-sale-alert.com, list-alert.com, Tempest,

21   jumpoffcampus.com, wishcan.com, and SnapStore.  Unless craigslist's anticompetitive scheme is

22   enjoined, other specialized search engines, such as JeBoom, PadMapper, and Lovely, likely will

23   suffer the same fate.  Meanwhile, the looming threat of sham litigation will continue to deter

24   potential competitors to craigslist from partnering with 3taps.  And, if the costs of litigation were to

25   force 3taps to cease indexing, other new innovators would be precluded from entering the Relevant

26   Markets through use of 3taps' pre-staged indexed data.

27       ///

28       ///

26

## II.  COPYRIGHT MISUSE

119.    craigslist has committed copyright misuse as part of its overall scheme to inhibit innovation and restrain competition in the Relevant Markets.

120.    craigslist's copyright misuse is evidenced by the filing of this lawsuit against 3taps, PadMapper, and Lovely, as well as its numerous other lawsuits and cease and disease letters threatening lawsuits against, *inter alia*, HuntSmartly, Invatory, for-sale-alert.com, list-alert.com, Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.  As is evident in these suits and cease and desist letters, craigslist engages in copyright misuse in at least two ways.

121.    First, craigslist engages in copyright misuse by claiming protection for material beyond the scope of any valid copyright.  Specifically, craigslist asserts that the factual content of user postings, which 3taps indexes and provides to partners like PadMapper and Lovely, is protected by copyright when such factual material plainly cannot be subject to any copyright protection.  Thus, craigslist is attempting to use the doctrine of copyright to secure an exclusive right or limited monopoly that could not be granted by the Copyright Office.

122.    Second, because craigslist is not the owner or exclusive licensee of its users' postings, it lacks standing to assert infringement of its users' copyrights, assuming *arguendo* that any such copyrights exist.

123.    craigslist's copyright misuse has caused numerous competitors to exit the Relevant Markets, and therefore, has furthered craigslist's scheme and had an anticompetitive impact on these markets.  For example, Ziink's Craigslist Helper was disabled in 2012 after it received a cease and desist letter from craigslist.  Similarly, after filing suit against 3taps, craigslist sent cease and desist letters to 3taps' partners, including HuntSmartly, Invatory, for-sale-alert.com, list-alert.com, Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.  These 3taps partners subsequently exited the search market.  Unless craigslist's anticompetitive scheme is enjoined, other specialized search engines, such as JeBoom, PadMapper, and Lovely, likely will suffer the same fate.

///

27

**III.**   <u>**"GHOSTING"**</u>

124.   Another component of craigslist's overall scheme is "ghosting," which is craigslist's practice of refusing to make visible posts or transmit messages that it believes are linked to its competitors, but falsely informing users who upload posts to craigslist from third-party competitor sites that such content actually has been made visible.  In fact, the user receives a confirmation and can view his or her own post, but the post is "ghosted" from anyone else on craigslist.

125.   For example, a craigslist competitor, such as AirBnB, may provide a user with the option to simultaneously upload posts to both the competitor's site and to craigslist.  The user posts content on AirBnB, and the AirBnB service then re-uploads the content to craigslist for the user.  This saves the user time and allows the user to target as many potential readers as possible.  Under such circumstances, craigslist might refuse to make the post visible to other users because of AirBnB's involvement, while providing the user with a false confirmation that his post has been uploaded for other users to see on craigslist.

126.   "Ghosting" is an anticompetitive mechanism that craigslist employs to discourage using competitive offerings for onboarding and to prevent competitors from gaining traction.  Because of "ghosting," users are more likely to forego posting on a competing site and simply post directly to craigslist, in order to retain access to craigslist's larger user base.

127.   Further, "ghosting" is especially pernicious because it undermines the credibility of competing websites.  For example, a user who attempts to post an ad on both craigslist and a competing site and is "ghosted" will receive a confirmation that his ad has been uploaded to craigslist.  Because the ad will not in fact be uploaded to craigslist, the user may believe that the competitor's site failed to work properly when, in reality, it was craigslist that blocked the user's attempted post.

128.   There is no legitimate business justification for "ghosting."  craigslist engages in ghosting to harm competition, protect its market share, and stifle innovation in the Relevant Markets; these are not legitimate business justifications.

129.   Rather than "ghosting," craigslist could simply inform users why it will not accept their posts or transmit their messages.  Instead, it pursues a course of conduct that diverts users

28

1  away from competitors and tarnishes their reputations.  Thus, "ghosting" is another means by

2  which craigslist seeks to maintain its monopoly positions in the Relevant Markets.

3  **IV.      IMPROPERLY RESTRICTIVE TERMS OF USE ON CRAIGSLIST'S USERS**

4          130.    craigslist's Terms of Use are an additional component of its scheme to inhibit

5  innovation and competition in the Relevant Markets.  The Terms of Use specifically prohibit

6  making "available any program, application or service . . . that enables or provides access to, use of,

7  operation of or interoperation with craigslist."  The Terms of Use also prohibit "[a]ny copying,

8  aggregation, display, distribution, performance or derivative use of craigslist or any content posted

9  on craigslist."

10         131.    These restrictions embodied in the Terms of Use are facially overbroad,

11  anticompetitive, and unenforceable.  The Terms of Use further craigslist's overall scheme by

12  prohibiting any innovator from attempting to create an indexing or search tool that is interoperable

13  with craigslist.  They also prevent users from using third-party search and interaction tools in their

14  listings that may be useful in communications with other users.  Similarly, the Terms of Use

15  prohibit any effort to innovate using content posted on craigslist's website.

16         132.    There is no legitimate business justification for these Terms of Use.  craigslist has

17  imposed these Terms of Use to harm competition, protect its market share, and stifle innovation in

18  the Relevant Markets; these are not legitimate business justifications.

19         133.    According to the Terms of Use, the above-referenced provisions are intended "[t]o

20  maintain the integrity and functionality of craigslist for its users."  But the development of

21  applications that are interoperable with craigslist and the use of content posted on craigslist for

22  purposes of innovation do not pose any threat of harm to the integrity or functionality of craigslist.

23         134.    Indeed, interoperable programs or applications would enhance the craigslist user

24  experience, at no cost to craigslist.  Similarly, the innovations that 3taps and partners like

25  PadMapper have developed with user-generated content posted on craigslist also benefit craigslist

26  and its users by making it easier to search content posted on craigslist and facilitating exchanges

27  among users.

28

135.    craigslist knows, however, that innovation in indexing or searching of craigslist's content paves the way for innovators to challenge craigslist's dominance in the Relevant Markets. Thus, craigslist imposes its overly restrictive Terms of Use to deter innovation of applications that are interoperable with craigslist, as well as innovations built on user-generated content posted on craigslist, to prevent competition in the Relevant Markets.

136.    Even if the challenged Terms of Use were not considered facially anticompetitive, craigslist has implemented (and attempted to enforce) them for an anticompetitive purpose, which, in turn, has caused (and will continue to cause) anticompetitive effects in the Relevant Markets.

## V.    ANTICOMPETITIVE RESTRICTIONS ON GOOGLE CACHES

137.    The above-discussed prohibition in craigslist's Terms of Use on any copying or distribution of user content has long-included an exception that specifically exempts general search engines, such as Google.  Historically, craigslist also has included a "NOARCHIVE" instruction in its HTML content to instruct search engines not to maintain caches of content posted on craigslist.

138.    craigslist's NOARCHIVE instruction, which essentially tells a search engine not to maintain any record of the content it already has copied, is facially anticompetitive.  The purpose of the instruction is to deny innovators and potential craigslist competitors access to user-generated content posted on craigslist without having to directly access craigslist's website, and therefore, risk running afoul of craigslist's anticompetitive Terms of Use.

139.    There is no legitimate business justification for the NOARCHIVE instruction. Google's maintenance of caches of content it already has copied from craigslist's website has no adverse consequences on craigslist or its users.  For example, the maintenance of caches does not increase the burden on craigslist's servers or pose any risk of harm to the functionality of its website.  Instead, craigslist imposed the NOARCHIVE instruction to harm competition, protect its market share, and stifle innovation in the Relevant Markets; these are not legitimate business justifications.

140.    Perhaps recognizing these facts, craigslist has not attempted to enforce the NOARCHIVE instruction despite the fact that Google has not honored this instruction.  Instead, for

30

1  years, craigslist has permitted Google to maintain caches of craigslist content, which are readily

2  available to the public.

3      141.  As described more fully above, 3taps has relied on Google caches as a source of

4  user-generated content posted on craigslist.  However, beginning on or around August 5, 2012,

5  3taps has been unable to rely solely on Google caches as a source of content posted on craigslist.

6  This is because the raw text version of this data is no longer available.  Instead, Google's caches

7  only include images of this content, and the quality of these images has been manipulated and

8  deliberately degraded for the sole purpose of making them impossible to scrape (even though they

9  can still be read).

10      142.  On information and belief, 3taps alleges that Google has taken measures, either at

11  craigslist's instruction or pursuant to an agreement with craigslist, to limit 3taps' ability to source

12  content posted on craigslist via Google caches.

13      143.  The agreement between craigslist and Google is a purely anticompetitive effort to

14  inhibit 3taps and its partners from competing with craigslist.  There is no legitimate business

15  justification for this agreement.  craigslist has entered into this agreement to prevent 3taps from

16  acquiring access to content posted on its website (or raise its costs of doing so) and to harm

17  competition, protect its market share, and stifle innovation in the Relevant Markets.  These are not

18  legitimate business justifications.

19      144.  craigslist has changed the long-established availability of its content via Google

20  caches solely to harm competition and block innovation by making it more difficult for 3taps and

21  specialized search engines to obtain content that remains in the public domain and previously could

22  be electronically scraped from Google with craigslist's knowledge.

23      145.  The absence of any legitimate business justification for craigslist's conduct is

24  illustrated by the fact that craigslist still makes its users' content available to Google, and such

25  content still can be viewed through Google caches.  The only change effected by the agreement

26  between craigslist and Google is that the quality of the content maintained in Google's caches has

27  been degraded so that it is no longer an effective source for 3taps.

28

146.     The timing of the change in the long-standing relationship between craigslist and Google illustrates craigslist's anticompetitive intent.  For years, Google has indexed and maintained caches of content posted on craigslist, and the raw text data underlying this content has remained available.  craigslist only acted to change this long-standing pattern shortly after filing suit against 3taps and around the same time that it abandoned the requirement that its users make craigslist the exclusive licensee of the content in their posts.

## VI.     BLOCKING 3TAPS AND THIRD PARTIES FROM SCRAPING CONTENT POSTED ON CRAIGSLIST

147.     As alleged in its First Amended Complaint, craigslist has blocked 3taps and third parties from scraping content posted on craigslist.  craigslist's conduct is intended to inhibit competition by 3taps and the specialized search engines that utilize the indexed content 3taps provides.

148.     As explained above, there is no legitimate business justification for this conduct. Instead, craigslist engages in this conduct to harm competition, protect its market share, and stifle innovation in the Relevant Markets; these are not legitimate business justifications.

149.     craigslist's Terms of Use prohibit "[a]ny copying, aggregation, display, distribution, performance or derivative use of . . . any content posted on craigslist" in order "[t]o maintain the integrity and functionality of craigslist for its users."  But scraping by 3taps and third parties working on behalf of 3taps does not adversely impact craigslist's integrity or functionality.  In fact, the innovations of 3taps and its partners benefit craigslist and its users by making it easier to search content posted on craigslist and facilitating exchanges among users.

150.     On information and belief, craigslist's efforts to block scraping by 3taps or other third parties cause craigslist to deny, or limit, access to craigslist by other users that are not seeking to compete with craigslist.  This further illustrates that there is no legitimate business justification for craigslist's conduct.

151.     To the extent there is any theoretical legitimate justification for limiting scraping (e.g., to avoid a material impact on craigslist's servers), craigslist's conduct directed at 3taps and

1  third parties goes well beyond what is reasonably necessary to further any such justification, and

2  instead unnecessarily restricts competition.

3      152.    craigslist's anticompetitive intent is evidenced by the context of its actions.  If

4  craigslist actually were concerned that scraping by 3taps and/or third parties working on behalf of

5  3taps would be harmful to craigslist or its users, it would not have acted to inhibit 3taps from

6  relying on Google caches as a source of content posted on craigslist.  After all, 3taps only is

7  attempting to scrape craigslist's website in order to obtain the type of content that 3taps formerly

8  obtained from Google without having to directly scape craigslist's website.

9      **CRAIGSLIST'S BELATED ATTEMPTS TO INNOVATE**

10      153.    In the face of its users' increasing demands for innovation, as well as competition,

11  craigslist has made some belated attempts to innovate.

12      154.    For example, shortly after it originally filed this lawsuit, craigslist began attaching

13  maps to some of its apartment listings.  Essentially, craigslist has attempted to adopt an

14  improvement to its site along the lines of the feature PadMapper was sued for introducing.

15  (craigslist's maps are not as sophisticated as PadMapper's because craigslist cannot aggregate

16  multiple listings onto a single map, as PadMapper does.)

17      155.    Similarly, craigslist has begun to improve its picture viewer, adopting a viewer akin

18  to that employed by craiggers.  craigslist in fact has the temerity to suggest that its alteration of its

19  picture viewer was craigslist's idea and that craiggers copied this innovation, but the inverse is true.

20      156.    craigslist's willingness to adopt these improvements indicates that it is aware of its

21  users' demand for innovation and the value that innovators like 3taps and PadMapper provide.  It

22  also reveals that craigslist's resistance to change is not the result of its professed desire to retain

23  simplicity as a "public service."  craigslist is happy to embrace innovation, so long as doing so will

24  not enhance the viability of its competitors or potential competitors.

25

26

27

28

3TAPS' FIRST AMENDED COUNTERCLAIM    CASE NO.: 12-CV-3816-CRB

**THE RELEVANT MARKETS**

**I.     The Relevant Antitrust Product Markets**

    **A.     The Market for Onboarding of Online Classified Ad Content**

157.     There is a relevant product market for the "onboarding" of online classified ad content.  Onboarding refers to the creation, posting, editing, and deletion of users' online classified ads.  After a user's ad is posted online, onboarding exchanges then curate and moderate the posts to thwart spam and inappropriate user content.

158.     The outer boundaries of the relevant product market for onboarding are determined by the reasonable interchangeability of use or the cross-elasticity of demand between onboarding of online classified ad content and potential substitutes for onboarding.

159.     Onboarding of classified ad content is not reasonably interchangeable with onboarding of other forms of online advertising—like search, display/banner, digital video, mobile, or rich media.  The target audience and business models for other forms of online advertising distinguish general online advertising from online classified advertising.  Indeed, experts in the field of online advertising distinguish the supply and demand for online classified ads from other forms of online advertising.  For example, the 2011 Internet Advertising Revenue Report published by Price Waterhouse Cooper and the Interactive Advertising Bureau provides supply and demand information for different segments of the online advertising industry, finding that revenues in the online classified ad market were approximately $2.6 billion in 2011, or 8-10% of the overall online advertising industry.  Onboarding of other forms of online advertising is beyond the outer boundaries of the relevant product market because unique supply and demand exists for the onboarding of classified ads.

160.     From the perspective of a user who wishes to onboard a post or a user who wishes to complete an exchange with a user who onboarded a post, there are no reasonable substitutes for onboarding of online classified ads.  For example, print newspaper classified ads are not reasonably interchangeable with online classified ads because print newspapers do not—and in fact cannot—enable users to sort or search classified ads in the way that users can sort and search online classified ads.  Print classified ads are published once daily (or even less frequently) and cannot be

1   edited once they are printed, whereas online ads can be published or edited at any time.  The reader

2   base for print classified ads is limited to subscribers of that publication, whereas online posts are

3   viewable by any internet user.  Additionally, pricing for print classified ads and online classified

4   ads confirms that these products occupy separate product markets.  Most print classified ads are

5   priced on a "line count" or "word count" basis, with additional fees for borders, logos, or colors

6   (which limits the amount and type of content that consumers of print classified ads can use),

7   whereas online classified ads on craigslist and its competitors' sites range from free for most

8   products to $75 for some job listings (with none of the restrictions posed by print classified ads).

9        161.    Similarly, users do not consider online auctions—such as eBay's auction site—to be

10  reasonably interchangeable with online classified ads.  Online auctions typically allow for multiple

11  buyers, across multiple geographies, to bid on items during a set time frame, whereas classified ads

12  allow a buyer who often is in the same geography as the seller to negotiate purchases in one-to-one

13  communication with the seller and then close the transaction in person, much as one does with a

14  newspaper classified ad.  Auctions involve goods that are paid for in advance (subject to fees for

15  people who post auctions) and are shipped anywhere through the mail, whereas classified ads allow

16  for face-to-face exchange of goods within a short time period after a listing is posted and where the

17  buyer can inspect the goods before payment.  Additionally, while auction sites only include "for-

18  sale" listings, classified ad users can post "wanted" ads for goods and services.  Moreover, auction

19  websites offer national sales, while classified ads operate in local exchange markets.  eBay created

20  eBay Classifieds in recognition of the difference between the markets for online auctions and

21  online classified ads.

22       162.    In addition to users who onboard or who purchase goods and/or services via

23  onboarded online classified ads, there are additional consumers in the downstream markets for

24  indexing and search of onboarded online classified ads, as discussed below.  These consumers do

25  not consider onboarded online classified ads to be reasonably interchangeable with any other

26  products.

27       163.    Further, a small but non-transitory increase in price in the onboarding market would

28  not cause users to switch to other products or to otherwise change their activities sufficiently to

1   make such a price increase unprofitable to the hypothetical monopolist.  Among other things, this

2   is demonstrated by craigslist's continued growth in the online classified ad submarkets for job

3   listings and housing listings after raising fees for postings in these submarkets from $0 to $10-$75.

4   There is no cross-elasticity of demand between onboarding and any alternative products, like print

5   classified ads, general online advertising, or online auctions.

6            164.    Upon information and belief, within the relevant market for the onboarding of

7   online classified ads, there are numerous submarkets for specialized types of online classified ads,

8   such as apartment listings, sale of used goods, and sale of services.  Users seek content within one

9   or more of these submarkets when accessing online classified ads.

10           165.    The content in each of the relevant submarkets is not reasonably interchangeable

11  from the perspective of the user.  For example, a user seeking an apartment listing will not look at

12  listings related to sales of used goods, services, or personal ads.

13           166.    Moreover, a small but non-transitory increase in price in each of the onboarding

14  submarkets would not cause users to switch to other products or to otherwise change their activities

15  sufficiently to make such a price increase unprofitable to the hypothetical monopolist.

16           167.    craigslist's monopoly power in the market and submarkets for onboarding of online

17  classified ad content is evidenced directly by its ability to exclude competitors.  When competitors

18  that also compete in the downstream search market—such as PadMapper—attempt to provide both

19  onboarding and search tools—such as PadMapper does through PadLister—craigslist, through its

20  market dominance and anticompetitive scheme, has been able to prevent those competitors from

21  entering and remaining in both the onboarding and search markets.

22           168.    craigslist's monopoly power also is demonstrated indirectly by its share in the

23  relevant market and submarkets.  craigslist is dominant in the overall product market for

24  onboarding of online classified ad content.  It has an approximately 90% share in the overall

25  market for the onboarding of classified ads across all segments, while its two closest competitors,

26  Backpage and eBay Classifieds, only have approximately 7% and 1.5% shares, respectively.  Other

27  distant competitors, such as OLX and Oodle, have even smaller shares.

28

169.    Upon information and belief, craigslist onboards approximately 1.2-1.5 million posts per day, whereas Backpage onboards only 100,000 new posts and eBay Classifieds onboards 20,000.  Distant competitors like OLX and Oodle onboard even fewer posts.

170.    According to reports from Hitwise, craigslist's local sites account for all but three of the top 100 online classified ad websites.

171.    Upon information and belief, craigslist also has monopoly power or a dangerous probability of achieving monopoly power in the submarkets for onboarding of online classified ads, such as for apartment rentals, sale of general goods, and sale of general services.

- Apartment Rentals:  Upon information and belief, craigslist's share in the apartment rental submarket is over 65% and may be as high as 77%. It competes against the niche onboarding sites PadMapper, Lovely, and other similar sites, which currently have de minimis shares because of craigslist's anticompetitive scheme.

- Sale of Goods:  Upon information and belief, craigslist's share in the sale of goods submarket is over 65% and may be as high as 90%.  craigslist does not face any significant competition from niche onboarding sites in this submarket.

- Sale of Services:  Upon information and belief, craigslist's share in the sale of services submarket is at least 55% and may be even higher. There is a dangerous probability that craigslist will obtain monopoly power in this submarket as it drives more users to its site as a result of network effects, whereby users are driven to the craigslist site to gain access to the large numbers of buyers that craigslist already attracts. craigslist does not face meaningful, across-the-board competition from any niche onboarding sites in this submarket.  craigslist's anticompetitive scheme inhibits new competitors from entering the market.

- Other Submarkets:  craigslist is a privately-held company that does not publish statistics regarding traffic and postings for many of the classified

37

1    ad categories offered on its website.  Upon information and belief,

2    craigslist may have monopoly power—or alternatively, may have the

3    dangerous probability of achieving monopoly power—in other classified

4    ad submarkets.

5    172.    The direct evidence of craigslist's actual control of the market for onboarding of

6    classified ads, as well as its monopoly market shares, demonstrate that craigslist has monopoly

7    power in the market for onboarding of online classified ads, as well as in the relevant submarkets

8    for onboarding of online classified ads.

9    **B.    The Market for Search-Engine Indexing of Classified Ad Content**

10   173.    A second relevant product market exists for search-engine indexing of onboarded

11   classified ad content.  Indexing refers to the collection, parsing, categorization, organization, and

12   storage of data to facilitate fast and accurate retrieval of information for search engines.  Data is

13   either normalized (i.e., coded by location or structured annotations, such as the number of

14   bathrooms or bedrooms in an apartment) or left free form (e.g., raw words).

15   174.    Indexing allows the results of an analysis of onboarded data to be organized into

16   rapidly searchable alphabetical or numerical data structures that power search requests and efficient

17   add, edit, or delete functions for updates to the data.  For example, in contrast to craigslist's index,

18   3taps' index enables the efficient addition of latitude and longitude specifications to classified ads

19   in the housing market.  These latitude and longitude specifications then can be used to create maps

20   (as PadMapper does) in the downstream market for the search of online classified ads.

21   175.    Indexing also allows for rapid summarization and subtotaling of data to allow users

22   to see the total number of matching postings in an adjoining location or category.  For example,

23   indexing enables a search engine to tally specific keywords across categories, and therefore helps

24   search engines find more relevant postings.

25   176.    3taps, craigslist, and other general onboarding websites—such as Backpage and

26   eBay Classifieds—are the only companies that engage in the indexing of onboarded classified ad

27   content across all categories (e.g., the submarkets for apartment rentals, job listings, sales of goods,

28   personal ads, etc.).  craigslist and other onboarding websites index their own respective onboarded

38

1    classified ad content for use in their search tools offered to users, whereas 3taps indexes the raw

2    classified ad content that has been onboarded onto craigslist and other third parties' websites,

3    which in turn 3taps offers to third-party search engine developers.

4        177.    Within the product market for the indexing of online classified ad content,

5    competitors can use several methods to index data.  For example, both scraping and application

6    programming interfaces ("APIs") can be used to index raw onboarded online classified ad content.

7        178.    "Scraping" is a process by which a computer analyzes a webpage on a consistent

8    basis (perhaps daily) to monitor and analyze the contents of the page.  For example, in the travel

9    sector, ITA searches for and scrapes travel data from some airlines' webpages for use by third-

10   party travel search sites.  Scraping is a slower and less efficient means of obtaining raw data for use

11   in indexing than an API, but companies can still compete effectively in the indexing market by

12   scraping.

13       179.    Alternatively, companies that have access to raw data have the option to use an API

14   to offer third parties access to their indexes in order to search their data or to receive a stream of

15   raw data so that third parties can create their own indexes of data ("third-party indexes").  craigslist

16   has chosen not to provide an API or any form of its index to third parties for search, nor does it

17   provide raw data that would enable third parties to build their own indexes.  Instead, craigslist

18   participates in the indexing market only to facilitate its own search engine and tools.

19       180.    craigslist does offer limited RSS feeds of its content, but these feeds cannot be used

20   to create an efficient and useful index.  The RSS feeds are updated only every fifteen minutes and

21   are limited to the last one hundred postings.  Therefore, if more than one hundred postings are

22   onboarded during a fifteen minute period, those posts do not appear in the RSS feeds.  In practice,

23   as much as seventy percent of data is lost.  Thus, developers cannot create useful indexes that

24   power downstream search offerings by relying on craigslist's RSS feeds.

25       181.    To the extent the data is available, third-party indexers such as 3taps also can source

26   the raw data associated with content posted on classified ad onboarding websites from general

27   search engines (e.g., Google, Bing, etc.).  Again, this is a slower, less efficient, and more expensive

28   means of obtaining raw data for use in indexing than an API.

39

182.     Third-party indexers must use one of these methods to collect raw data in order to create a useful and competitive index.  In turn, these indexes can be used downstream by real-time search engines that compete with craigslist in one or more search markets.  3taps has indexed onboarded classified ad content for use in downstream search applications for classified ads.  In this way, 3taps functions as a bridge between competitors in the onboarding market and competitors in the search market.

183.     The outer boundaries of the relevant product market for indexing are determined by the reasonable interchangeability of use or the cross-elasticity of demand between indexing of online classified ad content and potential substitutes for indexing.

184.     From the perspective of downstream providers of search engines (including the craigslist-captive search engine) and from the perspective of downstream search users, there are no reasonable substitutes for indexing of classified ad content.  Indexing is necessary for data to be quickly and efficiently searched, but indexing raw data is computationally complex and resource intensive.

185.     Many search engine companies in the downstream markets for the search of classified ads target particular classified ad submarkets.  Because of a lack of resources, specialized technical expertise, and time, these companies depend on search-engine indexing companies to analyze the raw data for use in their search engine tools.  Searching raw data that has not been pre-staged by indexing is too inefficient and slow to enable these search engine companies to build usable services on top of the onboarded data.

186.     For example, many third-party specialized search engines require indexed data to produce their products.  These search engines—like PadMapper in the housing sector, Kayak in the airline bookings sector, and AirBnB in the vacation rental sector—offer enhanced search capabilities to end-purchasers of each of these products.  Without pre-staged indexed data, these search engines would be too slow to perform quickly enough for users.

187.     Indeed, when analyzing Google's acquisition of ITA in 2011, the Department of Justice ("DOJ") reached similar market definition conclusions regarding the indexing market for airline travel information.  DOJ determined that there was a distinct antitrust market for "a

40

1   continuously-updated database of airline [raw data] and a software algorithm used to search the

2   database." DOJ found that downstream comparative search engines could not gather this raw data

3   on their own through scraping; these comparative search companies need pre-staged, indexed data

4   to remain fast and reliable.

5       188.   A small but non-transitory increase in price for search-engine indexing (whether

6   captive or assimilated via an API or scraping) would not cause users to switch to other products or

7   to otherwise change their activities sufficiently to make such a price increase unprofitable to the

8   hypothetical monopolist, because there are no alternative products. Therefore, there is no cross-

9   elasticity of demand between search-engine indexing of classified ad content and any other

10  products.

11      189.   craigslist's monopoly power is evidenced directly by its ability to exclude

12  competitors from the market for search-engine indexing of onboarded classified ad content. For

13  example, craigslist has successfully thwarted attempts by Oodle and NotifyWire to enter the

14  indexing market by blocking access to a large percentage of the onboarded data in the classified ad

15  market. Without the craigslist data to index, these companies simply did not have enough raw data

16  to create a useful index for search engines, and they could not attain meaningful market share to

17  effectively compete in the indexing market.

18      190.   craigslist's monopoly power in the indexing market for classified ad content also is

19  demonstrated indirectly by its share in this market. craigslist controls 90% of the overall online

20  onboarded classified ad content for indexing (65% or more in the relevant onboarding and indexing

21  submarkets for apartment listings and the sale of goods and 55% or more in the relevant

22  onboarding and indexing submarket for the sale of services). Because of this control over the data

23  that needs to be indexed, craigslist's share in the indexing market roughly equates to its share in the

24  onboarding market and submarkets: 90% for general onboarded content, 65% or more in the

25  relevant onboarding submarkets for apartment listings and the sale of goods, and 55% or more in

26  the relevant onboarding submarket for the sale of services, as described above in Paragraphs 168

27  and 170.

28

191.   Accordingly, craigslist has monopoly power in the market for search-engine indexing of onboarded classified ad content.

**C.   The Relevant Market for Real-Time Search Services of Indexed Online Classified Ad Content**

192.   A third relevant product market—and related submarkets—exists for "real-time" search services for indexed classified ad content.  A real-time search engine provides the most recent results for a set of search criteria, as opposed to PageRank search services, which return the most authoritative results for a set of search criteria.  For real-time search engines, the unit of data is a posting, whereas for PageRank search engines, the unit of data is a webpage.

193.   In the market for real-time search of indexed online classified ad content, real-time search service providers enable users to search simultaneously for online classified ads in multiple cities on multiple websites across multiple criteria.

194.   The outer boundaries of the relevant product market for search are determined by the reasonable interchangeability of use or the cross-elasticity of demand between real-time search of indexed online classified ad content and potential substitutes for search.

195.   "Real-time search services" is a relevant antitrust product market because no other search service is as useful and convenient to consumers.  There are no reasonable substitutes for this product.

196.   A small but non-transitory increase in price for real-time search services of indexed online classified ad content would not cause users to switch to other products or to otherwise change their activities sufficiently to make such a price increase unprofitable to the hypothetical monopolist.  Therefore, there is no cross-elasticity of demand between real-time search services of indexed online classified ad content and any other product.

197.   When analyzing the Google-ITA transaction, DOJ found a distinct antitrust market for this type of search service of airline data.  Similarly, here, real-time search services of indexed online classified ad content constitutes a relevant product market for antitrust purposes.

198.   Real-time search services are distinct from the products provided by general web search engines, like Google or Bing.  These general search engines use a method called PageRank

42

1  to search the internet by determining the relevance and authority of web pages as a basis for search.

2  PageRank is based on how many incoming links a web page has, and in turn, how authoritative a

3  page is.

4        199.    Because PageRank search engines return hits based on page links, these search

5  engines are inadequate vehicles for searching classified ads to execute an exchange of a particular

6  type of product or service.  In fact, a PageRank search tool generally will return hits for the most

7  viewed pages—meaning that a user typically will obtain a search result for the oldest, and therefore,

8  most stale classified ad posting.  Additionally, PageRank search engines have no mechanism by

9  which to rate user experience with buyers or sellers.

10        200.    Within the real-time search engine market, real-time search engines may offer

11  specialty search tools,  interaction tools, and/or onboarding, in addition to their primary search

12  service.  Specialty search tools include creative visualizations, such as tremaps or steamgraphs,

13  which display creative, visually compelling versions of onboarded content.  "Interaction" refers to

14  applications that allow users to interact, sometimes in real time.  These applications include

15  identity services, messaging tools—like Message.Me or mobi-digger, which send messages

16  directly between two users—payment tools, like PayPal or CloudCash, or credit verification tools.

17        201.    Some real-time search providers offer additional complementary interaction

18  products or allow users who search for classified ads using their search engine to use third-party

19  interaction tools.

20        202.    Despite user demand for these interaction products, craigslist only offers what it did

21  fifteen years ago:  anonymized email.  It does not provide any interaction products related to text

22  messaging or payment, nor does it support the use of any third-party interaction tools.  Rather, as

23  described below, its terms of use block a user's ability to use any of these tools.

24        203.    craigslist's monopoly power is evidenced directly by its ability to exclude

25  competitors from the market for real-time search of indexed online classified ad content.  As a

26  result of its anticompetitive scheme, craigslist has caused the exit of numerous nascent search

27  competitors, including craiggers, HuntSmartly, Invatory, for-sale-alert.com, list-alert.com, Tempest,

28  jumpoffcampus.com, wishcan.com, and SnapStore.  In addition, absent relief from this court,

43

    

1  several other search competitors are likely to exit the market, including PadMapper, JeBoom, and

2  Lovely.

3       204.    craigslist's monopoly power also is evidenced indirectly by its share in the search

4  market and submarkets.  Because of craigslist's historical control of the onboarding markets, as

5  well as its control over indexed data, craigslist historically has controlled the markets related to

6  real-time search of indexed online classified ad content.  Its share in the search market therefore

7  roughly equates to its share in the onboarding market and submarkets:  90% for general onboarded

8  content, 65% or more in the relevant onboarding submarkets for apartment listings and the sale of

9  goods, and 55% or more in the relevant onboarding submarket for the sale of services, as described

10 above in Paragraphs 168 and 170.

11      205.    Significantly, craigslist's dominance in each of these markets is interrelated.  For

12 example, competitors like PadMapper would not be able to provide a useful search tool without

13 access to onboarded classified ads and the underlying facts and public data that craigslist

14 improperly seeks to control.  As a result of craiglist's anticompetitive scheme, PadMapper is

15 inhibited from attracting users to its search site to demonstrate the superiority of its search and

16 interaction tools—like the PadMapper map based on latitude and longitude coordinates of housing

17 postings or message.me features.  PadMapper therefore has a harder time gaining a critical mass of

18 users to break into the onboarding market.  In fact, PadMapper.com experienced a dramatic decline

19 in visits once craigslist data was removed from the site, a fact confirmed by traffic statistics from

20 alexa.com, as well as the allegations in paragraph 102 of craigslist's First Amended Complaint.

21 **II.    Relevant Geographic Market**

22      206.    The relevant geographic markets are each of the local city-by-city markets in the

23 United States in which a user can turn to find the posts for which he or she is looking.

24      207.    A small but non-transitory increase in price for onboarding of online classified ad

25 content (or for the interrelated search-engine indexing and real-time search services of these

26 classified ads) in one city generally would not cause users to onboard, index, or search classified

27 ads for these items in other cities.  Therefore, a small but non-transitory increase in price in one

28 city would be profitable to the hypothetical monopolist.

44

1    208.    A person posting an apartment listing in one city would not post the apartment

2  listing in another city as a result of an increase in price related to posting the classified ad.  A

3  search engine looking for indexed data related to apartment posts in one city would not switch to

4  indexed data from another city due to an increase in price.  A user searching for apartment posts in

5  one city would not switch to searching for apartment posts from another city due to an increase in

6  price.

7    209.    Similarly, a person posting a listing for goods in one city would not post in another

8  city as a result of an increase in price related to posting the classified ad.  A search engine looking

9  for indexed data related to posts for goods in one city would not switch to indexed data from

10  another city due to an increase in price.  A user searching for posts for goods in one city would not

11  switch to searching for posts for goods from another city due to an increase in price.

12    210.    A person posting a listing for general services in one city would not post in another

13  city as a result of an increase in price related to posting the classified ad.  A search engine looking

14  for indexed data related to posts for general services in one city would not switch to indexed data

15  from another city due to an increase in price.  A user searching for posts for general services in one

16  city would not switch to searching for posts for general services from another city due to an

17  increase in price.

18    211.    Therefore, there is no cross-elasticity of demand for users between cities for the

19  relevant markets related to classified ad content.

20    212.    Upon information and belief, craigslist's share is over 65% in many of the local

21  geographic markets for onboarding, and craigslist has a dangerous probability of achieving

22  monopoly power in other local markets for onboarding.

23    213.    Alternatively, in the relevant markets for search-engine indexing and real-time

24  search services, developers use nationwide onboarded online classified ad content.  Upon

25  information and belief, craigslist's share is over 65% in the nationwide relevant markets and

26  submarkets for indexing and search of onboarded online classified ads.

27    ///

28    ///

45

III.    **Barriers To Entry**

214.    Historically, potential competitors in the onboarding market could not break into the onboarding market and gain significant market share because of the barriers to entry and barriers to expansion created by the network effects enjoyed by craigslist.  craigslist overwhelmingly dominates the market for onboarding of online content, and therefore, has the most users.  For instance, in terms of onboarded posts, it has a 15 to 1 advantage over its next closest competitor, BackPage, and a 75 to 1 advantage over its second closest competitor, eBay Classifieds.  Thus, users need to post to craigslist to increase their chances of having a successful exchange.  This drives users away from alternative sites like BackPage and eBay Classified, which offer attractive alternative products.

215.    These barriers to entry are evidenced by the failed attempts of well-funded internet players to enter and gain share in the online classified ad markets.  For example, eBay has been unable to gain significant share in the Relevant Markets in the United States.  eBay successfully competes in the markets for the onboarding, indexing, and search of online classified ads outside of the United States, where craigslist historically has had low market shares.  However, as a result of craigslist's dominant presence in the United States and network effects, eBay Classifieds has been unable to gain traction in the Relevant Markets; in fact, its share in the market for onboarding of classified ads across all market segments is only about 1.5% in the United States.

216.    Similarly, Yahoo! Pipes was unable to facilitate third-party development of successful applications in the downstream markets for indexing and search of online classified ads. Yahoo! Pipes—a web application provided by Yahoo!, Inc. (a general search engine company)—is an interface that aggregates web feeds, web pages, and other services for use by developers building mashups.  As part of this aggregation, Yahoo! Pipes collected craigslist content via craigslist's RSS feed.  The RSS feed is subject to many contractual obligations, including that the content cannot be used for commercial purposes.

217.    Romy Maxwell, a Yahoo! Pipes developer, used the Yahoo! Pipes feed to create "Flippity," a mashup which would plot craigslist onboarded listings on a map, thereby enabling users to see what goods were being sold in his or her proximity.  In 2009, Mr. Maxwell contacted

46

1   Craig Newmark to seek guidance about complying with craigslist's restrictive Terms of Use for the

2   RSS feed and provided a link to a working alpha version of Flippity.  Maxwell indicated that the

3   project was "non-commercial" and therefore complied with craigslist's Terms of Use, but asked if

4   the site could seek donations to cover its costs.  Mr. Newmark was silent on these questions, and

5   craigslist shortly thereafter took measures to block Flippity's access to the RSS feed—and, soon

6   thereafter, took the same steps for every other Yahoo! Pipes project (including those for non-

7   commercial purposes).  As a result, Yahoo! Pipes was unable to successfully facilitate the entry of

8   third-party developers into Relevant Markets.

9       218.    As long as craigslist's anticompetitive scheme remains in place to block entry and

10   expansion in all the Relevant Markets and submarkets, this overwhelming market dominance and

11   network effect will continue.  craigslist will remain the overwhelmingly dominant onboarding site

12   that offers onboarding across all classified ad submarkets, and classified ad users are more likely to

13   be familiar with craigslist as a destination for onboarding of online classified ads over niche

14   specialty websites that facilitate onboarding for particular types of online classified ads.  Thus,

15   users are more likely to recognize craigslist as the dominant website for classified ad content and

16   rely on craigslist for all of their online classified ad needs, even if users are only interested in

17   onboarded content in a particular submarket and could find a better onboarding or search offering

18   at these niche sites.

19                           **INJURY TO COMPETITION AND CONSUMERS**

20       219.    craigslist has maintained its monopoly power in the onboarding, indexing, and

21   search markets for classified ads to the detriment of consumers.

22       220.    3taps is endeavoring to provide a method whereby specialized search engines can

23   provide better search services to consumers.  3taps has the capabilities and resources to create an

24   efficient index.

25       221.    craigslist's anticompetitive scheme, taken as a whole, limits the ability of 3taps to

26   offer this pre-staged, indexed data, and prevents specialized search engines—including PadMapper,

27   craiggers, JeBoom and others—from offering alternative, attractive products to consumers that

28   allow for better, more efficient searches across multiple classified ad sites.  It also inhibits these

47

1    companies from competing in the onboarding market, as PadMapper has attempted to compete via
2    PadLister.

3          222.    craigslist's anticompetitive scheme therefore reduces the output of competitive
4    products offered in the onboarding, indexing, and search markets for online classified ads and
5    thereby limits consumer choice in these markets.

6          223.    Additionally, craigslist's anticompetitive scheme reduces quality in the onboarding,
7    indexing, and search markets for online classified ads by precluding innovation and excluding
8    superior products from the Relevant Markets.

9          224.    craigslist's anticompetitive scheme is designed to prevent real-time search engines
10   from competing in the onboarding space and offering consumers a more streamlined, efficient
11   service for onboarding.  Thus, craigslist's anticompetitive behavior prevents users from having
12   access to alternative, attractive onboarding products.

13         225.    If craigslist succeeds in its efforts to use its monopoly power to inhibit 3taps' and its
14   partners' competitive offerings, or even forces 3taps out of the indexing market, consumers will not
15   have access to superior search services and superior onboarding products that real-time search
16   engines are developing.

17                    **ANTITRUST INJURY TO 3TAPS, CRAIGGERS, AND JEBOOM**

18         226.    3taps has standing to bring Sherman Act claims both as a direct competitor of
19   craigslist in the indexing market and as an essential bridge between onboarding markets and other
20   competitors in the search markets.  3taps also has standing as the owner of craiggers, a direct
21   competitor of craigslist in the search market and as the owner of JeBoom, a direct competitor of
22   craigslist in the search market and a potential competitor in the onboarding market.

23         227.    As a direct result of craigslist's anticompetitive scheme, 3taps has suffered loss in
24   the value of its substantial capital investment in 3taps, lost business opportunities, and damage to
25   its property in the indexing market.  For example, after craigslist brought this baseless suit against
26   3taps, many of 3taps' search engine partners exited the downstream search market, and craigslist
27   was thereby able to avoid competition with these competitors, such as HuntSmartly, Invatory, for-
28   sale-alert.com, list-alert.com, Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.  If

48

1   craigslist's anticompetitive scheme is not enjoined, 3taps will continue to lose other potential

2   partners in the search market.

3       228.    Not only has craigslist's anticompetitive scheme caused 3taps to lose partners, it has

4   had a direct and enormous impact on the value of 3taps' business as a going concern.  But for

5   craigslist's anticompetitive scheme, 3taps would enjoy a going concern value that is exponentially

6   greater than it currently has.  For example, ITA was acquired by Google for $700 million in 2011.

7   3taps believes that its indexing business similarly would be valued in the hundreds of millions of

8   dollars, or more, but for craigslist's anticompetitive scheme.

9       229.    3taps also was forced to shut down craiggers as a result of craigslist's

10  anticompetitive scheme and has lost the value of its significant investment in craiggers and suffered

11  damage to its property in the search market.  Further, craiggers has lost users and tremendous value

12  to its business as a going concern.  Other major search providers are worth hundreds of millions of

13  dollars or more.  For example, in November 2012, Kayak was acquired by Priceline.com for $1.8

14  billion.  Trulia, which searches real estate listings, became a publicly-traded company in September

15  2012 and currently has a market capitalization of approximately $450 million.  As described above,

16  AirBnB has been valued at approximately $1.3 billion.  3taps believes that, but for craigslist's

17  anticompetitive scheme, craiggers would be worth hundreds of millions of dollars, as well.

18      230.    Finally, unless craigslist's anticompetitive scheme is enjoined, JeBoom may suffer

19  the same fate as craiggers.  As a result, 3taps would suffer damage to its property in the search

20  market and lose the value of its substantial capital investments in JeBoom, as well as the value of

21  JeBoom's business opportunities and value as a going concern.  At the very least, if JeBoom is

22  deprived of craigslist data, the value of its business would decline substantially.

23

24

25

26

27

28

49

# CAUSES OF ACTION

## COUNT I

**(Sherman Act § 2 claim for monopolization and attempted monopolization of the onboarding market and related submarkets)**

231.    3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 230 as if fully set forth herein.

232.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade and commerce among the States, as well as attempts to monopolize any part of the trade and commerce among the States.

233.    craigslist has monopoly power in the Relevant Market for the onboarding of classified ad content, and it has maintained this power through anticompetitive behavior.

234.    craigslist has engaged in an anticompetitive scheme, including filing serial sham litigation and threatening such litigation, copyright misuse, ghosting, imposing improperly restrictive Terms of Use on users, imposing anticompetitive restrictions on Google caches, and blocking 3taps and third parties from scraping content posted on craigslist's website, to acquire, enhance, and/or maintain this monopoly power in the Relevant Market for onboarding of classified ad content in violation of Section 2 of the Sherman Act.

235.    Each aspect of the overall scheme described above is anticompetitive conduct that itself violates the antitrust laws.  In addition, each act, in combination with one or more other aspects of the overall scheme, has the purpose and effect of furthering the overall scheme to maintain craigslist's monopoly power in this Relevant Market, and the resulting synergistic effects of the scheme independently violate the antitrust laws.

236.    If for any reason, craigslist is deemed not to have monopoly power in the Relevant Market or Submarkets for onboarding of classified ad content, there is a dangerous probability that craigslist will acquire such power.

237.    craigslist's anticompetitive scheme has given it the power to control pricing and exclude competition in the Relevant Market.

50

238.    Upon information and belief, network effects impose high barriers to entry and expansion for any potential new entrant into the Relevant Market.  These barriers are evidenced by the failures of major companies—such as eBay and Yahoo!—to enter and gain traction in the Relevant Market.

239.    craigslist's willful and wrongful maintenance and/or extension of its monopoly power (or its attempt to monopolize) is not the result of growth and development as a result of innovation, business acumen, or by virtue of offering a superior product.  Rather, it is a direct consequence of craigslist's intentional, exclusionary conduct in connection with its anticompetitive scheme.

240.    There is no efficiency-enhancing, procompetitive justification for craigslist's behavior.

241.    craigslist's anticompetitive scheme alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the Relevant Market for onboarding through decreased output, reduced choice, reduced innovation, and other anticompetitive effects including raising additional barriers to entry in the Relevant Market.

242.    By reason of craigslist's unlawful monopolization and/or attempted monopolization of the onboarding content market, 3taps—a competitor in the downstream market for indexing which serves as a bridge to the search market for onboarded classified ad content—has been injured in its business and property.  Similarly, craigslist's anticompetitive scheme threatens to injure JeBoom by inhibiting its entry into the onboarding market.

243.    Unless enjoined and declared illegal, craigslist's unlawful conduct will continue, 3taps, as well as its website JeBoom, will continue to sustain injury and damages, and competition will continue to decrease in the Relevant Market.

244.    The injuries to 3taps, JeBoom, other competitors, consumers, and competition described herein are the types of injuries that the antitrust laws are designed to prevent because they are a direct result of craigslist's illegal, anticompetitive scheme to exclude competitors from the market.

245.    3taps is entitled to injunctive relief and treble damages.

51

## COUNT II

**(Sherman Act § 2 claim for monopolization and attempted monopolization of the indexing market and related submarkets)**

246.     3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 230 as if fully set forth herein.

247.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade and commerce among the States, as well as attempts to monopolize any part of the trade and commerce among the States.

248.     craigslist has monopoly power in the Relevant Market for the indexing of classified ad content, and it has maintained this power through anticompetitive behavior.

249.     craigslist has engaged in an anticompetitive scheme, including filing serial sham litigation and threatening such litigation, copyright misuse, ghosting, imposing improperly restrictive Terms of Use on users, imposing anticompetitive restrictions on Google caches, and blocking 3taps and third parties from scraping content posted on craigslist's website, to acquire, enhance, and/or maintain this monopoly power in the Relevant Market for the indexing of classified ad content in violation of Section 2 of the Sherman Act.

250.     Each aspect of the overall scheme described above is anticompetitive conduct that itself violates the antitrust laws.  In addition, each act, in combination with one or more other aspects of the overall scheme, has the purpose and effect of furthering the overall scheme to maintain craigslist's monopoly power in this Relevant Market, and the resulting synergistic effects of the scheme independently violate the antitrust laws.

251.     If for any reason, craigslist is deemed not to have monopoly power in the Relevant Market or Submarkets for indexing of classified ad content, there is a dangerous probability that craigslist will acquire such power.

252.     craigslist's anticompetitive scheme has given it the power to control pricing and exclude competition in the Relevant Market.

253.     Upon information and belief, network effects have resulted in high barriers to entry for any potential new entrant into the Relevant Market.  These barriers to entry are evidenced by

52

1  craigslist's ability to keep major companies—such as Yahoo!—from accessing the raw data from

2  which an index could be developed for use in the downstream search market.

3  254.  craigslist's willful and wrongful maintenance and/or extension of its monopoly

4  power (or its attempt to monopolize) is not the result of growth and development as a result of

5  innovation, business acumen, or by virtue of offering a superior product.  Rather, it is a direct

6  consequence of craigslist's intentional, exclusionary conduct in connection with its anticompetitive

7  scheme.

8  255.  There is no efficiency-enhancing, procompetitive justification for craigslist's

9  behavior.

10  256.  craigslist's anticompetitive scheme alleged herein has injured (and unless enjoined,

11  will continue to injure) consumers and competitors in the Relevant Market for indexing through

12  decreased output, reduced choice, reduced innovation, and other anticompetitive effects including

13  raising additional barriers to entry in the Relevant Market.

14  257.  craigslist's anticompetitive scheme alleged herein also has injured (and unless

15  enjoined, will continue to injure) consumers and competitors in the downstream, interrelated

16  Relevant Market for real-time search through decreased output, reduced choice, reduced innovation,

17  and other anticompetitive effects including raising additional barriers to entry in that Relevant

18  Market.

19  258.  By reason of craigslist's unlawful monopolization and/or attempted monopolization

20  of the indexing market, 3taps—a direct competitor in the market for indexing, which serves as a

21  bridge to the downstream search market—has been injured in its business and property.  Similarly,

22  craigslist's anticompetitive scheme has injured craiggers and JeBoom, neither of which can provide

23  its search product without pre-staged, indexed data from 3taps.

24  259.  Unless enjoined and declared illegal, craigslist's unlawful conduct will continue,

25  3taps, craiggers, and JeBoom will continue to sustain injury and damages, and competition will

26  continue to decrease in the Relevant Market.

27  260.  The injuries to 3taps, craiggers, JeBoom, competitors, consumers, and competition

28  described herein are the types of injuries that the antitrust laws are designed to prevent because

53

they are a direct result of craigslist illegal, anticompetitive scheme to exclude competitors from the market.

261.     3taps is entitled to injunctive relief and treble damages.

## COUNT III

**(Sherman Act § 2 claim for monopolization and attempted monopolization of the real-time search market and related submarkets)**

262.     3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 230 as if fully set forth herein.

263.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade and commerce among the States, as well as attempts to monopolize any part of the trade and commerce among the States.

264.     craigslist has monopoly power in the Relevant Market for the search of indexed classified ad content, and it has maintained this power through anticompetitive behavior.

265.     craigslist has engaged in an anticompetitive scheme, including filing serial sham litigation and threatening such litigation, copyright misuse, ghosting, imposing improperly restrictive Terms of Use on users, imposing anticompetitive restrictions on Google caches, and blocking 3taps and third parties from scraping content posted on craigslist's website, to acquire, enhance, and/or maintain this monopoly power in the Relevant Market for the search of indexed classified ad content in violation of Section 2 of the Sherman Act.

266.     Each aspect of the overall scheme described above is anticompetitive conduct that itself violates the antitrust laws.  In addition, each act, in combination with one or more other aspects of the overall scheme, has the purpose and effect of furthering the overall scheme to maintain craigslist's monopoly power in this Relevant Market, and the resulting synergistic effects of the scheme independently violate the antitrust laws.

267.     If for any reason, craigslist is deemed not to have monopoly power in the Relevant Market or Submarkets for search of indexed classified ad content, there is a dangerous probability that craigslist will acquire such power.

268.    craigslist's anticompetitive scheme has given it the power to control pricing and exclude competition in the Relevant Market.

269.    Upon information and belief, network effects have resulted in high barriers to entry for any potential new entrant into the Relevant Market.  These barriers to entry are evidenced by the failures of other companies—such as Yahoo! Pipes—to successfully facilitate third party developers from entering the Relevant Market and offering competitive search tools—such as Flippity.

270.    craigslist's willful and wrongful maintenance and/or extension of its monopoly power (or its attempt to monopolize) is not the result of growth and development as a result of innovation, business acumen, or by virtue of offering a superior product.  Rather, it is a direct consequence of craigslist's intentional, exclusionary conduct in connection with its anticompetitive scheme.

271.    There is no efficiency enhancing, procompetitive justification for craigslist's behavior.

272.    craigslist's anticompetitive scheme alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the Relevant Market for search through decreased output, reduced choice, reduced innovation, and other anticompetitive effects including raising additional barriers to entry in the Relevant Market.

273.    By reason of craigslist's unlawful monopolization and/or attempted monopolization of the search market, 3taps—a competitor in the upstream market for indexing which serves as a bridge to the search market—has been injured in its business and property.  Similarly, craigslist's anticompetitive scheme has injured craiggers and JeBoom by preventing these websites from offering their competitive search products.

274.    Unless enjoined and declared illegal, craigslist's unlawful conduct will continue, 3taps, craiggers, and JeBoom will continue to sustain injury and damages, and competition will continue to decrease in the Relevant Market.

275.    The injuries to 3taps, craiggers, JeBoom, other competitors, consumers, and competition described herein are the types of injuries that the antitrust laws are designed to prevent

55

1 because they are a direct result of craigslist illegal, anticompetitive scheme to exclude competitors

2 from the market.

3      276.    3taps is entitled to injunctive relief and treble damages.

4 **COUNT IV**

5 **(Sherman Act § 1 claim based on craigslist's Terms of Use)**

6      277.    3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1

7 through 230 as if fully set forth herein.

8      278.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, (1) a contract,

9 combination or conspiracy among two or more persons or distinct business entities; (2) which is

10 intended to harm or restrain trade or commerce among the several States, or with foreign nations;

11 (3) which actually injures competition; and (4) that harms the plaintiff as a result of the

12 anticompetitive aspect of the practice under scrutiny.

13      279.    craigslist's Terms of Use with each of its users are contracts between distinct

14 entities that craigslist has entered into for the purpose of restraining trade in the Relevant Markets.

15      280.    craigslist has market power in each of the Relevant Markets.

16      281.    There is no efficiency enhancing, procompetitive justification for craigslist's

17 challenged Terms of Use.

18      282.    craigslist's improperly restrictive Terms of Use have injured (and unless enjoined,

19 will continue to injure) consumers and competitors in the Relevant Markets through decreased

20 output, reduced choice, reduced innovation, and other anticompetitive effects including raising

21 additional barriers to entry in the Relevant Markets.

22      283.    By reason of craigslist's unlawful Terms of Use, 3taps has lost potential business

23 partners and been injured in its business and property.  Similarly, the Terms of Use have harmed,

24 and threaten to harm, craiggers and JeBoom by inhibiting these websites from offering their

25 competitive search products.  The Terms of Use also threaten to prevent JeBoom from competing

26 in the onboarding market.

27

28

56

1    284.    Unless craigslist unlawful Terms of Use are enjoined and declared illegal, 3taps,

2    craiggers, and JeBoom will continue to sustain injury and damages, and competition will continue

3    to decrease in the Relevant Markets.

4    285.    The injuries to 3taps, craiggers, JeBoom, other competitors, consumers, and

5    competition described herein are the types of injuries that the antitrust laws are designed to prevent

6    because they are a direct result of craigslist's unlawful agreements imposed on each of its users.

7    286.    3taps is entitled to injunctive relief and treble damages.

8    ## <u>COUNT V</u>

9    **(Sherman Act § 1 claim based on craigslist's agreement with Google)**

10   287.    3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1

11   through 230 as if fully set forth herein.

12   288.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, (1) a contract,

13   combination or conspiracy among two or more persons or distinct business entities; (2) which is

14   intended to harm or restrain trade or commerce among the several States, or with foreign nations;

15   (3) which actually injures competition; and (4) that harms the plaintiff as a result of the

16   anticompetitive aspect of the practice under scrutiny.

17   289.    On information and belief, craigslist has entered into an agreement with Google that

18   has caused Google to reduce the availability of craigslist content that can be obtained through

19   electronic scraping of Google caches.

20   290.    This agreement unreasonably restrains trade in each of the Relevant Markets.

21   291.    craigslist has market power in each of the Relevant Markets.

22   292.    There is no efficiency enhancing, procompetitive justification for the agreement

23   between craigslist and Google.

24   293.    craigslist's agreement with Google has injured (and unless enjoined, will continue to

25   injure) consumers and competitors in the Relevant Markets through decreased output, reduced

26   choice, reduced innovation, and other anticompetitive effects including raising additional barriers

27   to entry in the Relevant Markets.

28   294.    By reason of this agreement, 3taps—a competitor in the market for indexing which

57

1   serves as a bridge to the search market—has been injured in its business and property because

2   3taps' ability to obtain user-generated content posted on craigslist has been inhibited and its costs

3   of acquiring such content have increased.  Likewise, the same conduct harms competition generally

4   in the indexing market.

5          295.    This agreement also has harmed and threatens to harm competitors in the

6   downstream search market, including craiggers and JeBoom, that cannot compete without 3taps'

7   index.  Further, competitors that compete (or plan to compete) in the onboarding market, including

8   PadMapper and JeBoom, have been injured and face the threat of injury because of their reliance

9   on 3taps' index.

10         296.    Unless craigslist's unlawful agreement with Google is enjoined and declared illegal,

11  3taps, craiggers, and JeBoom will continue to sustain injury and damages, and competition will

12  continue to decrease in the Relevant Markets.

13         297.    The injuries to 3taps, craiggers, JeBoom, other competitors, consumers, and

14  competition described herein are the types of injuries that the antitrust laws are designed to prevent

15  because they are a direct result of the agreement between craigslist and Google.

16         298.    3taps is entitled to injunctive relief and treble damages.

17                                    **<u>COUNT VI</u>**

18            **(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 et seq.)**

19         299.    3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1

20  through 230 as if fully set forth herein.

21         300.    This court has jurisdiction over this cause of action based on the doctrine of

22  supplemental jurisdiction (28 U.S.C. § 1367) because this cause of action arises from the same

23  transactions and from a common nucleus of operative facts as alleged in the federal causes of

24  action alleged in this Counterclaim.

25         301.    craigslist is a "person" within the meaning of California Business & Professional

26  Code § 17201.

27

28

1    302.    As alleged herein, craigslist's conduct constitutes "unfair" business practices.

2    Conduct that significantly threatens or harms competition or threatens an incipient violation of an

3    antitrust law may be deemed unfair.

4    303.    As alleged herein, craigslist's anticompetitive conduct also is unlawful.  craigslist's

5    violations of the federal antitrust laws, or other laws as alleged herein, satisfy the unlawful prong of

6    California Business & Professional Code § 17200.

7    304.    The injuries to 3taps, craiggers, JeBoom, other competitors, consumers, and

8    competition described herein are the direct result of craigslist's unfair and unlawful practices and

9    conduct.

10    305.    Unless enjoined and declared illegal, craigslist's unlawful conduct will continue,

11    3taps will continue to sustain financial injury and damages to its business and property, and

12    competition will continue to decrease in the Relevant Markets.  These injuries are a direct and

13    proximate result of craigslist's unfair and unlawful conduct.

14    306.    Pursuant to California Business & Professional Code § 17203, 3taps is entitled to

15    permanent and mandatory injunctive relief against craigslist to enjoin craigslist's ongoing wrongful

16    business conduct.  An injunction is needed to enable and restore competition in the Relevant

17    Markets.

18                                              **COUNT VII**

19                               **(Interference with Economic Advantage)**

20    307.    3taps repeats and incorporates by reference the allegations set forth in Paragraphs 1

21    through 230 as if fully set forth herein.

22    308.    This court has jurisdiction over this cause of action based on the doctrine of

23    supplemental jurisdiction (28 U.S.C. § 1367) because this cause of action arises from the same

24    transactions and from a common nucleus of operative facts as alleged in the federal causes of

25    action alleged in this Counterclaim.

26    309.    3taps had the reasonable probability of a business opportunity with partners in the

27    specialized search engine market, including with HuntSmartly, Invatory, for-sale-alert.com, list-

28    alert.com, Tempest, jumpoffcampus.com, wishcan.com, and SnapStore.

                                                  59

1   310.   craigslist has engaged in anticompetitive conduct to exclude 3taps, craiggers, and

2   JeBoom from the Relevant Markets.  Through this unlawful conduct, craigslist intentionally

3   interfered with the opportunities that 3taps and its search websites were pursuing with many other

4   developers, such as Lovely, HuntSmartly, Invatory, for-sale-alert.com, list-alert.com, Tempest,

5   jumpoffcampus.com, wishcan.com, and SnapStore.

6   311.   craigslist's unlawful conduct caused 3taps to sustain financial injury and damages to

7   its business and property in an amount to be established at trial.

8   312.   These injuries are a direct and proximate result of craigslist's interference with

9   3tap's prospective business relations.

10   **PRAYER FOR RELIEF**

11   WHEREFORE, 3taps demands that judgment be entered in its favor and against craigslist:

12   (a)   declaring that craigslist has monopolized or attempted to monopolize each of the

13   Relevant Markets in violation of Section 2 of the Sherman Act;

14   (b)   declaring that craigslist's Terms of Use are unlawful agreements that unreasonably

15   restrain trade in the Relevant Markets in violation of Section 1 of the Sherman Act;

16   (c)   declaring that craigslist's agreement with Google to limit the availability of

17   craigslist content available through Google caches is an unlawful agreement that unreasonably

18   restrains trade in the Relevant Markets in violation of Section 1 of the Sherman Act;

19   (d)   enjoining craigslist from unlawfully interfering with competition in the Relevant

20   Markets by filing serial sham litigation and threatening such litigation, copyright misuse, ghosting,

21   imposing improperly restrictive Terms of Use on users, imposing anticompetitive restrictions on

22   Google caches, blocking 3taps and third parties from scraping content posted on craigslist's

23   website, and engaging in any other anticompetitive conduct.

24   (e)   declaring that the conduct alleged in this Counterclaim is adjudged to be unfair

25   and/or unlawful in violation of Sections 17200 *et seq.* of the California Business and Professions

26   Code;

27   ///

28   ///

60

1          (f)      awarding 3taps treble damages, reasonable attorney's fees, costs, expenses, and such

2    further relief as the Court deems just and proper.

3

4    Dated: December 21, 2012              SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5

6                                         /s/ Allen J. Ruby

7

8                                         Allen J. Ruby
                                          *Attorneys for Defendant*
9                                         3TAPS, INC.

10                          **DEMAND FOR JURY TRIAL**

11        Defendant and Counter-Claimant 3TAPS, INC. hereby requests a jury trial in this matter.

12

13   DATED:  December 21, 2012            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

14                                        BY:    /s/ Allen Ruby

15

16                                        Allen J. Ruby
                                          *Attorneys for Defendant*
17                                        3TAPS, INC.

18

19

20

21

22

23

24

25

26

27

28

3TAPS' FIRST AMENDED COUNTERCLAIM                          CASE NO.: 12-CV-3816-CRB